472 So.2d 409 (1985)
David Randolph GRAY
v.
STATE of Mississippi.
No. 55738.
Supreme Court of Mississippi.
June 5, 1985.
Rehearing Denied July 24, 1985.
*411 Earl B. Stegall, Otto A. Wusnack, Gulfport, for appellant.
Edwin Lloyd Pittman, Atty. Gen. by Marvin L. White, Jr. and William S. Boyd, III, Sp. Asst. Attys. Gen., Jackson, for appellee.
En Banc.
David Randolph Gray was indicted, along with Attina Marie Cannaday and Dawn Bushart, for capital murder for the kidnapping and homicide of one Ronald Wojcik, but tried separately. Gray's trial preceded Cannaday's, but her appeal was heard first. Cannaday v. State, 455 So.2d 713 (Miss. 1984). Gray's trial resulted in a guilty verdict and imposition of the death penalty. On appeal, he asserts that the trial court erred during the guilt phase in:
1. denying his motion for the return of two prisoners from Parchman to testify on his behalf;
2. overruling objections to the prosecutor using a prior inconsistent statement to impeach its own witness;
3. overruling a motion for mistrial after a state witness commented on Gray's right to remain silent;
4. failing to instruct the jury as to the elements of the underlying felony of kidnapping;
5. failing to grant a lesser included offense instruction on simple murder;
6. refusing to grant lesser included offense instructions on manslaughter and kidnapping; and
7. refusing certain circumstantial evidence instructions.
Gray asserts that the trial court erred in the sentencing phase in:
8. overruling his objection to admission into evidence of copies of an arrest warrant and revocation of probation form;
9. including in the sentencing instruction the aggravating circumstance of whether the murder was committed for pecuniary gain, and
10. failing to charge the jury to make the findings required by Enmund v. Florida.
Finally, Gray contends that our Supreme Court proportionality review:
11. is inadequate under the express terms of Mississippi Code Annotated § 99-19-105 (Supp. 1984), and, in any event, his death sentence is disproportionate with other comparable cases.
Part I of the Court's opinion, authored by Justice Sullivan, will discuss these assignments of error.
*412 Part II, authored by Justice Dan Lee, will address Gray's assertion that the trial court erred in:
12. excluding a prospective juror for cause in violation of his right to trial by an impartial jury.

FACTS
Some time after midnight on June 3, 1982, Ronald Wojcik and Sandra Sowash were awakened and forced by knifepoint from Wojcik's Biloxi apartment by Attina Cannaday, David Gray, and Dawn Bushart. All five got into Wojcik's van and Cannaday drove to a remote wooded area north of Gulfport.
On the way, Gray raped Sowash at knifepoint in the rear of the van.
After the van stopped, Cannaday told Wojcik to get out. When he hesitated, Gray pulled him out. Holding a butcher knife to Wojcik's back, Gray marched him 50 to 60 feet into the woods. Cannaday yelled "Kill him", and Gray yelled back for Cannaday to bring Sowash into the woods to him.
Sowash turned and ran down the road. Cannaday threw her knife at Sowash but the handle hit her in the back. Sowash hid at a nearby house, while Cannaday, Gray and Bushart fled to Slidell, Louisiana. At sunrise, the body of Ronald Wojcik was found with 19 stab wounds to the head, hands, upper body, and back.
Gray stated that after he yelled for Sowash to be brought out, Wojcik hit him. Dropping the knife, Gray had a fist fight with Wojcik in which Gray knocked him to the ground, breathless. Picking up the knife, Gray suddenly saw Cannaday who asked for the knife and said she wanted to talk to Wojcik. Gray did so, telling her to say what she had to, but to make it fast. Gray then returned to the road. About five minutes later, Cannaday returned. He asked her what happened, and she replied, "Nothing, he got up and ran off." Gray denied using the butcher knife against Wojcik at any time during or after the fight. He said Cannaday did not return with the butcher knife. He likewise denied ever using either of the folding knives in his possession against Wojcik.
Sowash gave the police a detailed description of Wojcik's white van, as well as the name of Tina as a participant. Sheriff's deputies knew that Cannaday had connections in Slidell, Louisiana, and informed the Louisiana authorities to be on the lookout for the white van and occupants. Wojcik's wallet was found on the highway near Slidell.
Wojcik's van was sighted near Slidell, and Gray and one Timmy Page were arrested. Cannaday was arrested at Page's residence.

LAW

PART I
SULLIVAN, Justice, for the Court:

A. GUILT PHASE

1. REFUSAL TO SUMMON PRISONERS
Gray argues that the trial court's refusal to order the return of prisoners Halbert and Breland from Parchman to testify in his behalf violated his right under Mississippi Constitution Article 3, § 26, and United States Constitution Amendment VI, that in all criminal prosecutions the accused shall have the right "... to have compulsory process for obtaining witnesses in his favor...." See United States v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); Washington v. Texas, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967). Gray filed a motion three days prior to trial requesting an order to return the two prisoners. The morning of trial, he offered in support of his motion a letter from Halbert stating that a prisoner (identified by defense counsel as Breland) was told by Cannaday while they were in the Biloxi jail that she had tried to cut off Wojcik's head. Gray argues that the sole basis for the trial judge's refusal was the expense of transporting the prisoners from Parchmen to the Gulf Coast.
*413 The trial judge did refer to the expense of transferring prisoners in ruling on this motion, but the primary basis for overruling Gray's request was that the testimony of Breland as to what Cannaday told him would be inadmissible hearsay if offered to prove the truth of the fact asserted. Murphy v. State, 453 So.2d 1290, 1293-94 (Miss. 1984). Also, any testimony by Halbert as to what Cannaday told Breland would be double hearsay, unless each link fits under an exception to the hearsay rule. Id. at 1294.
The judge recognized that if Cannaday took the stand as a witness, waived her Fifth Amendment right to remain silent, and denied that she took part in the murder, then Breland's testimony that she said she cut off Wojcik's head might have been admissible to impeach her testimony as a prior inconsistent statement. Therefore, the trial judge ruled that, if the proper predicate were laid for impeaching Cannaday, he would reconsider his ruling on the motion to transfer. The trial judge also was made aware that Breland had discussed the matter with defense counsel and said that, if brought back, he would not testify. At trial, Cannaday was called by Gray to testify but she invoked the Fifth Amendment right to remain silent on all matters concerning the murder.
The trial judge's refusal to order the attendance of the two prisoners was based on the lack of a colorable need for them to be summoned. The court correctly foresaw the fact that Cannaday, whose trial followed Gray's, would choose to remain silent, so that no basis arose for Halbert and Breland to be summoned to give their otherwise inadmissible testimony. Even so, the trial court left its ruling open for reconsideration in the event that Cannaday's testimony allowed for impeachment. It has been observed that the accused's right to compulsory process is not absolute and the state may require a showing of some colorable need for persons to be summoned lest the right be abused. Passman v. Blackburn, 652 F.2d 559, 566 (5th Cir.1981). The motion to return Halbert and Breland from Parchman was addressed to the trial court's sound discretion, and we cannot conclude that Gray has demonstrated that the court's ruling was so fundamentally unfair as to deprive him of due process of law. See United States v. Wilson, 732 F.2d 404, 412 (5th Cir.1984).
Gray's reliance on Gradsky v. State, 243 Miss. 379, 137 So.2d 820 (1962), is misplaced. In that case we held that a defendant may summon his own attorney to give evidence vital to his defense, even though it may cause the lawyer embarrassment or raise the appearance of an ethical violation. Unlike Gradsky, supra, the admissibility of evidence which Gray sought to introduce through the prisoners was contingent upon the laying of a proper predicate which failed to materialize. This assignment of error is without merit.

2. STATE IMPEACHING ITS OWN WITNESS
Gray argues that the state's use of prior statements to impeach its own witness, Timothy Page, was improper because it was not shown that Page's testimony took the state by surprise nor that Page was unexpectedly hostile. Moffett v. State, 456 So.2d 714 (Miss. 1984). In Moffett, we affirmed that a party is prohibited from impeaching his own witness with a prior statement when he knows reasonably well in advance that the witness has repudiated the statement. Id. at 718-19. Applying the standard in Hall v. State, 250 Miss. 253, 165 So.2d 345 (1964), we concluded that the state was not genuinely taken by surprise by witness Johnson's repudiation of his prior statement nor was Johnson unexpectedly hostile. Id.
In this case, Timothy Page was summoned from Louisiana by the state to testify against Gray about the events from the time of the arrival of the three suspects at Page's Slidell home until his arrest while riding with Gray in Wojcik's white van.
On direct examination, Page testified that he noticed Gray had a skinned place on his hand, some "bad things on his knuckles" and a little blood on his elbow. Gray *414 told Page that he got in a fight with a couple of men in a bar in Mississippi. Toward the end of direct examination, the state asked Page numerous leading questions, to which Page gave unresponsive answers. The state persisted, and Gray's objection to leading questions was sustained. The state asked Page if he remembered giving a statement. Gray objected to the state impeaching its own witness. The trial court sustained this objection and overruled the state's plea of surprise.
On redirect, the state returned to the leading form of questioning and pursued the matter of Gray's fight in a bar. Page said that all Gray said was he whipped them. The state asked, "Didn't he brag to you about ...?", at which point Gray objected to the state continuing to lead its witness. The trial court sustained the objection and overruled requests to treat Page as a hostile witness. The state asked how Gray was acting, to which Page replied, "He was, uh, acting like nothing happened." The state offered to refresh Page's memory with his statement, to which defense counsel objected but the court let the state show Page this statement. Page said he recalled making the statement. Asked to read the statement, Page replied that he could not read. The state then asked Page if he made the following statement. Defense counsel's objection was overruled. The state read Page the following:
Q. Was there anything about David that seemed strange?
A. Yes, sir. When David handed me a drink of Jack Daniel's from the bottle, I don't remember which arm it was, but he had dried blood on his arm, just below his hand. And the opposite hand, his knuckles were skinned. It looked like to me he had cut his hand, hitting someone in the mouth or teeth. I asked him what had happened. And he said he had got into a fight somewhere in Mississippi with two dudes, and he was bragging about how bad he was ...
Q. Anything you would like to add, at this time?
A. The dude, David, was real nervous. And when I was looking around, he didn't want me to look around too much inside of the van.
Page acknowledged making that statement and admitted that Gray appeared shaky. The state attempted to further question Page regarding his prior statement but the court refused to sustain the plea of surprise, because Page had been in the district attorney's office for two days. The prosecutor responded, "I didn't know he would lie. I thought he would testify like his statement." The judge on his own motion told the jury to disregard the district attorney's remarks.
In this case the trial court ruled that the state could not treat Page as a hostile witness, but in fact allowed the prosecutor to use Page's prior statement to the police to impeach his earlier assertion that Gray was acting like nothing had happened.
Gray contends that there could be no true surprise since the state had two days in which to question Page concerning his statement and did not do so. Gray further complains that after the trial court ruled adversely to the state, the prosecutor accused Page of being a liar in the presence of the jury. Gray contends that the witness's prior statements had a prejudicial effect on his sentencing determination and require reversal under Cannaday v. State, 455 So.2d 713 (Miss. 1984).
We will first lay to rest the question of the prosecutor's remark. While the remark was improper, the trial judge corrected the matter instantly by admonishing the jury to disregard the comment. Ratliff v. State, 317 So.2d 403, 405-06 (Miss. 1975); Clanton v. State, 279 So.2d 599 (Miss. 1973).
This case can be distinguished from Moffett, supra, on its facts in that this record contains no indication that the witness Page ever informed the state or defense counsel that he would not testify in accordance with the statement he had given the police in Slidell. Indeed, it would have been surprising if the illiterate Page *415 had informed anyone that he intended to testify differently from a statement which he could not read. We look now to Hall v. State, supra, to determine whether the prosecutor was surprised and the witness unexpectedly hostile. In the absence of any indication to the contrary, the state may genuinely not have expected Page to be hostile since he was a friend of Cannaday, not Gray. Page proved to be less than cooperative during his direct examination by the state, and the leading questions were due in part to Page's non-responsive answers. When, on redirect, Page said that Gray was acting like nothing happened, the state may genuinely have been surprised given the strength of his earlier statement that Gray was acting "real nervous" and did not want Page looking around in the van. Thus the state laid a predicate to impeach Page as an unexpectedly hostile witness.
Even were this not so, Page's trial testimony and out-of-court statement both corroborated Gray's version of the story, when Gray himself took the stand and testified. In fact, Page's testimony concerning Gray's fist fight would not have prejudiced Gray but rather bolstered his defense.
Gray's assertion that Page's statement that Gray bragged "about how bad he was" unduly prejudiced the jury pales when compared with his co-defendant's admission, ruled inadmissible on appeal, that she tried to break off Wojcik's head. Cannaday, supra, at 721. We conclude that the state laid a predicate for impeaching Page with his prior statements and, even were this not so, the statements were not so inflammatory as to infect the sentencing phase of his trial. Cannaday, supra, at 724.

3. COMMENT ON GRAY'S RIGHT TO REMAIN SILENT
The incident in question occurred while the state was questioning Officer Joe Kennedy, of the St. Tammany Parish sheriff's department, concerning his arrest of Gray:
After you had advised them both of their rights, did you have occasion to ask either one of them or, in particular, David Gray, any questions?
A. The only thing I asked Gray was, uh, about the ownership of the vehicle.
Q. And did he respond to that question?
A. He indicated that the van belonged to his girl friend.
Q. Okay.
Did he say anything further to you?
A. He went on to state to me that, uh, that he knew his rights and he wasn't going to say anything. I told him... .
BY MR. STEGALL:
(Interposing) If it please the Court, I'm going to object to that and ask to approach the Bench.
BY THE COURT: I sustain your objection.
Gray moved for a mistrial on the ground that the witness's testimony constituted a comment upon his exercise of his Fifth Amendment right to remain silent. The court overruled the motion. Gray did not request nor was he given a curative instruction at that time. In arguing that his death sentence should be vacated for improper comment on his failure to offer sworn testimony, Gray argues that we should follow our holding in Williams v. State, 445 So.2d 798 (Miss. 1984). This contention is based on a misunderstanding of our holding in Williams. The defendant in Williams was allowed to make an unsworn opening statement and the prosecutor commented to the jury in closing on the defendant's failure to give his version of the facts while under oath. We held in that case that it was not necessary to hold that this error standing alone constituted reversible error. Instead, we considered the combined influence of this error with two other improper comments by the prosecutor concerning appellate review and the possibility of parole. Taken together, we then held that their aggregate effect was to deny Williams a fair sentencing hearing. Id. at 801.
*416 Evidence of post-arrest silence violates due process because it is fundamentally unfair to afford a suspect the right to remain silent and yet allow implications of his silence to be used against him. Doyle v. Ohio, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). However, we recognized in Austin v. State, 384 So.2d 600, 601 (Miss. 1980), that a prosecutor's comment about a defendant's silence, though improper, was harmless error in view of the overwhelming evidence of guilt beyond reasonable doubt. See Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). In this case, the single reference by the witness to Gray's intention to remain silent was neither repeated nor linked with Gray's exculpatory statement. Moreover, the trial judge charged the jury at the conclusion of trial that no adverse inference may be drawn by the invocation of the right to remain silent by a witness or an accused. These factors, together with the overwhelming evidence of guilt beyond reasonable doubt, lead us to conclude that the improper comment in this case was harmless error. Austin v. State, supra, Chapman v. California, supra.
Gray's invocation of Williams v. State, supra, is unpersuasive in that it was not solely the improper prosecutor's comment, but the aggregate effect of several distinct improper arguments that required reversal of Williams' sentencing phase. This assignment of error is without merit.

4. FAILURE TO DEFINE ELEMENTS OF KIDNAPPING
The state did not offer nor did Gray request an instruction defining the elements of the underlying felony which elevates this murder to capital murder. See Miss. Code Ann. § 97-3-19(2)(e) (Supp. 1984). During the course of his testimony, Gray admitted to the forcible seizure and concealment of Sowash and Wojcik against their will. Cf. Miss. Code Ann. § 97-3-53 (Supp. 1984) (kidnapping). Gray argues that the trial court's failure to instruct the jury regarding the elements of kidnapping denied him due process of law in that the jury could not determine his guilt or innocence of the crime charged unless given some legal guidance as to what are the elements of the crime of kidnapping. The absence of legal guidance, according to Gray, makes the jury's finding of guilt unreliable, contrary to the high level of reliability required in capital cases. Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976).
There is no merit to this assignment of error because Gray makes no objection to the instructions offered by the state and, more importantly, failed to submit an instruction to the trial judge on the elements of kidnapping. The combined failure to object or to request an appropriate instruction operates to waive any objection on this issue. Billiot v. State, 454 So.2d 445, 462 (Miss. 1984); Gilliard v. State, 428 So.2d 576, 583 (Miss. 1983). This assignment of error is without merit.

5. FAILURE TO INSTRUCT THAT SIMPLE MURDER WAS LESSER INCLUDED OFFENSE
The trial court was never requested to instruct the jury on the lesser included offense of simple murder. Newell v. State, 308 So.2d 71 (Miss. 1975), holds that the trial judge shall not be put in error for his failure to instruct on any point of law unless specifically requested in writing to do so. Id. at 78. This rationale has been applied by this Court in death penalty cases. Gilliard v. State, 428 So.2d 576, 583 (Miss. 1983). We cannot conjecture that the trial court would have refused Gray's proffered instruction on simple murder, had one been offered to him. There is no merit to this assignment.

6. REFUSAL TO INSTRUCT THAT MANSLAUGHTER AND KIDNAPPING WERE LESSER INCLUDED OFFENSES
During discussion of the jury instructions, Gray's attorney asked the court to permit him to draft a manslaughter instruction for submission as a lesser included offense on the ground that the jury *417 could consider Gray's story to be true that he fought Wojcik and killed him in the heat of passion but without malice. The court ruled that even if defense counsel had it ready, it would not be granted under the facts of this case.
Gray argues that his testimony that Wojcik hit him and they engaged in a fist fight offers the basis for presenting to the jury the affirmative proposition that his actions were "without malice aforethought" and in the heat of passion. The state responds that, even taking the evidence in the light most favorable to Gray, there is no way that it could be said to support a finding that Gray killed Wojcik without malice aforethought and in the heat of passion. Gray armed himself and two others, abducted two people at knifepoint, took them into the woods north of Gulfport, led Wojcik into the woods at knifepoint, and then, accepting Gray's testimony, beat Wojcik to the ground breathless. He then supplied the knife to Cannaday and left Wojcik to her tender mercies.
A comparison of this case with Lanier v. State, 450 So.2d 69 (Miss. 1984), demonstrates what sort of proof must be shown in order for a manslaughter instruction to be an appropriate lesser included offense. Lanier's confession indicated that he was accosted by a policeman late at night and made to remove all of his personal belongings from a bag. The officer having drawn his gun, reacted when Lanier removed his own weapon from the bag and the officer fired at Lanier. Lanier returned fire, hitting him. Certain physical evidence corroborating Lanier's confession was held to be sufficient to submit to the jury the question of whether Lanier, surprised by the police officer, killed him without malice aforethought and in the heat of passion. Id. at 79-81.
The well settled law in this state is that jury instructions are not given unless there is an evidentiary basis for such in the record. Colburn v. State, 431 So.2d 1111, 1114 (Miss. 1983); Fairchild v. State, 459 So.2d 793 (Miss. 1984). In our opinion, there is no evidentiary basis in the record for concluding that Gray acted in the heat of passion and without malice aforethought. Gray's entire testimony in the record is that he never stabbed Wojcik. If, by submitting the issue of manslaughter, Gray admits that he stabbed Wojcik, there does not appear to be anything in the record that changes the character of that killing from its malicious and premeditated origin. See Fairchild v. State, supra, at 801-02 (Miss. 1984). The trial court correctly rejected Gray's request for a manslaughter instruction.
As for Gray's requested instruction D-13 which would have permitted the jury to find him not guilty of capital murder but guilty of kidnapping, this Court resolved this precise issue involving an identical jury instruction against Gray's co-defendant in Cannaday v. State, 455 So.2d at 724. We noted that murder and manslaughter may be lesser included offenses of capital murder, but kidnapping is not. Id. at 725. Therefore, there is no merit to the assignment that the trial court erred in refusing to grant the lesser included offense instruction on kidnapping.

7. REFUSAL OF CERTAIN CIRCUMSTANTIAL EVIDENCE INSTRUCTIONS
Instruction D-4 told the jury that it does not have the right to convict upon mere suspicion nor upon the preponderance of the evidence but only upon evidence that he was guilty beyond all reasonable doubt and to a moral certainty and to the exclusion of every reasonable hypothesis consistent with innocence. The court refused this instruction and instead granted instruction C. 13SC which informed the jury that the law presumes the defendant to be innocent and places the burden upon the state to prove him guilty of every material element of the crime beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence.
Instruction D-5 cautioned the jury not to indulge in speculation, conjecture, or guesswork. Further it instructed the jury that where there is a controverted issue of fact *418 and the testimony fails to show beyond all reasonable doubt that the state's contention in regard to that issue is true, then the presumption of innocence controls. Instead, the court granted instruction C-1 which also informed the jury that its verdict should be based on the evidence and not upon speculation, guesswork or conjecture. The court also granted instruction D-8, which provided that if there are facts in the case susceptible of two interpretations, one favorable and the other unfavorable to the accused, and if there is a reasonable doubt as to the correct interpretation, then the jury must resolve the doubt in favor of the accused.
Finally, the court refused instruction D-11, which informed the jury that it did not have to explain its verdict to a living soul and that a verdict of acquittal will not mean that the jury is convinced of Gray's innocence but only that a reasonable doubt remains in their minds.
It is well settled in this state that where defendant's instructions on circumstantial evidence are properly covered by other instructions given by the court, the trial court will not be put in error for refusing to grant other instructions on the same point using alternative language. Bullock v. State, 391 So.2d 601 (Miss. 1980); Jones v. State, 381 So.2d 983, 991 (Miss. 1980).
A very strong circumstantial evidence instruction was granted to Gray and read to the jury which accomplished essentially the same thing that any of the other refused instructions would have done. There was no error in refusing to grant the other circumstantial evidence instructions. We have carefully reviewed all of the assignments of error offered by Gray affecting the guilt phase of his trial and we find that none of them are meritorious. We, therefore, affirm the conviction of David Randolph Gray for the crime of capital murder.

B. SENTENCING PHASE

8. ADMISSION OF ARREST AND PROBATION REVOCATION FORMS
The state introduced into evidence at the sentencing hearing a commitment paper from Jones County indicating that Gray had been convicted of aggravated assault upon a law enforcement officer and had been placed on probation for three years. Attached to the commitment paper were the arrest warrant and probation revocation forms which indicated that he had committed another unnamed violation of law. Defense counsel objected to introduction of the order of the circuit court because of the additional writing on the bottom. This referred to the fact that the commitment paper indicated that Gray's probation was revoked and his three-year sentence was reinstated.
Gray argues that this evidence should not have been admitted at trial under the rule that proof of a crime different from that alleged in the indictment is not submissible against the accused. Gray v. State, 351 So.2d 1342, 1345 (Miss. 1977); West v. State, 463 So.2d 1048 (Miss. 1985). In West, we held it to be error for the jury to see during the sentencing phase a copy of the defendant's Georgia conviction which recited that he had been found guilty of capital murder and sentenced to death. We found that this information impermissibly lessened the burden upon the jury as to whether their verdict was the only final determination on the question of whether the death penalty would be imposed upon West. Id. at 1052-53.
Gray further argues that the introduction of the probation revocation evidence was irrelevant to any of the aggravating circumstances the state was allowed to prove and was prejudicial because it suggested that Gray had committed other crimes. Gray further argues that he was not represented by counsel at the probation revocation hearing and, therefore, his Sixth Amendment right to counsel was violated.
The papers in question only showed that Gray did eventually serve time for the aggravated assault conviction, but do not reveal the crime for which his probation was revoked. Furthermore, the inference that Gray had committed another unnamed *419 crime could not have prejudiced him in any way differently from his own admission from the witness stand of convictions for aggravated assault, grand larceny, and cattle theft. Gray admitted to the jury that he served around 28 months in prison and was last paroled from the penitentiary in August of 1981.
Gray's situation is readily distinguishable from West v. State, supra, because nothing in the probation revocation forms indicated that Gray had already been sentenced to death, so that their admission could not have lessened the jury's burden in returning a second death sentence. The state properly points out in its argument that this record is completely silent as to whether Gray was represented by counsel at the probation revocation hearing and this Court will not act on such naked assertions.

9. INCLUDING PECUNIARY GAIN AS AN AGGRAVATING CIRCUMSTANCE
Under this assignment, Gray argues that there was a "doubling up" of aggravating circumstances when the trial court instructed the jury that it could consider both whether the murder was committed for pecuniary gain and whether it occurred during the course of the kidnapping. Gray contends that these two aggravating circumstances arose from the same aspect of the crime. This question has been decided adversely to Gray in Jordan v. State, 464 So.2d 475, 478-79 (Miss. 1985), Irving v. State, 441 So.2d 846 (Miss. 1983); Hill v. State, 432 So.2d 427 (Miss. 1983); Gilliard v. State, 428 So.2d 576 (Miss. 1983); and Smith v. State, 419 So.2d 563 (Miss. 1982). In Henry v. Wainwright, 721 F.2d 990 (5th Cir.1983), the Fifth Circuit Court of Appeals rejected this same constitutional argument holding that resolution of the issue was a question of state law.
There is no merit to this assignment of error.

10. INSTRUCTIONS REQUIRING ENMUND FINDINGS
Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982) construed the Eighth Amendment to forbid imposition of the death penalty against "one who neither took life, attempted to take life, nor intended to take life". Id. at 786, 102 S.Ct. at 3371. Gray claims that his death sentence must be set aside because there was neither a finding nor sufficient evidence to support a finding that he killed or intended to kill Wojcik in the course of the kidnapping. Gray's conviction occurred prior to the amendment of the Mississippi Death Penalty statute to require the jury to make Enmund findings. See Miss. Code Ann. § 99-19-101(7) (Supp. 1984).
Instruction S-1 at the guilt phase required the jury to make Enmund findings because in order to find Gray guilty the jury had to believe from the evidence beyond a reasonable doubt that Gray did "unlawfully, wilfully, and feloniously and of his malice aforethought kill and murder ... Ronald Wojcik, while engaged in the commission of the crime and felony of kidnapping." (emphasis added) Also, instruction S-3 told the jury that malice aforethought "is a predetermination to commit an act without legal justification or excuse." Jordan v. Watkins, 681 F.2d 1067 (5th Cir.1982), holds that the "intent to commit" murder standard was met where identical instructions were given to those in the case sub judice. There the Court found that the charge to the jury that it could not convict appellant absent a finding that he intended to commit murder meant that the jury's verdict could be read only to reflect such a finding. Id. at 1076-77. The testimony of Gray reflected that Cannaday asked Gray to get some knives and come with her to help scare her ex-boy friend, Wojcik. Gray said that she asked him to kill Wojcik; he said he would help her scare Wojcik but would not kill him. Gray claimed that after he marched Wojcik at knifepoint into the woods, he was going to scare Wojcik and tell him to run. When they got into a fight, Gray punched Wojcik as hard as he could. Then, handing his butcher knife to Cannaday, Gray left.
*420 In Jones v. Thigpen, 741 F.2d 805 (5th Cir.1984), the Fifth Circuit reversed the defendant's conviction because there was no evidence indicating that the defendant killed or assisted his accomplice in killing the victim, or that he supplied the murder weapon, or even that he knew his accomplice intended that a killing occur. In that case, the Fifth Circuit said that, had the state introduced such evidence, the death penalty would not be disturbed. 741 F.2d at 817. In this case, Gray admitted that Cannaday told him she wanted Wojcik killed and that he, Gray, supplied Cannaday with the murder weapon after disabling the victim. This admission by Gray establishes the requisite personal culpability under Enmund v. Florida, and there is no merit to this assignment of error.

11. SUFFICIENCY OF PROPORTIONALITY REVIEW
We are urged by Gray that Mississippi Code Annotated § 99-19-105(3)(c) (Supp. 1984), requires us to compare his death penalty with all capital murder cases, even though a life sentence is imposed and whether or not the case was even appealed to this Court. Gray further argues that we should compare appealed capital convictions where a life sentence was imposed with cases where the death penalty was imposed. Gray contends that a detailed examination and review of all capital murder cases is necessary to achieve the justice that the proportionality requirement envisions. We reject this contention. In Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), the Supreme Court of the United States held that such a review is not constitutionally mandated, being exclusively a question of state law. In Gray v. Lucas, 677 F.2d 1086 (5th Cir.1982), the Fifth Circuit said:
Gray claims that the Mississippi Supreme Court's comparative review of death sentences is flawed since the Court only compared Gray's case with those cases where the death sentence had been imposed and not with all the cases where it could have been imposed. Because the Supreme Court has rejected a similar argument in Proffitt v. Florida, 428 U.S. 242, 258-59 fn. 16, 96 S.Ct. 2960, 2969-70 fn. 16, 49 L.Ed.2d 913 (1976), we reject this claim as well.
677 F.2d at 1111.
We find no basis in this assignment of error and it is rejected.

PART II
DAN M. LEE, Justice, for the Court:

12. EXCLUDING A PROSPECTIVE JUROR FOR CAUSE, IN VIOLATION OF HIS RIGHT TO TRIAL BY AN IMPARTIAL JURY
It may correctly be said that the right of an accused to be tried by a jury of his or her peers is the foundation of fairness and the hallmark of our judicial system. U.S. Const. Amend. VI; Miss. Const. art. III § 26. This Court and the United States Supreme Court have frequently written of the significance of the jury's role. See, Fuselier v. State, 468 So.2d 45 (1985); Wiley v. State, 449 So.2d 756 (Miss. 1984); Sanders v. State, 440 So.2d 278 (Miss. 1983) and Duren v. Missouri, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979). In fact, the jury is so engrained in our notion of a trial that it has become the subject of great drama such as Reginald Rose's Twelve Angry Men. Unfortunately the common place acceptance of the jury system sometimes results in taking that right for granted, making the importance of the jury's role not as readily appreciated by those who do not have a direct stake in the outcome of the proceedings. Every trial lawyer and judge is well aware of the difficulties posed by citizens reluctant to give of their time and attention to help administer our system of justice. It was just such reluctance which presented the trial court with some troublesome decisions in the instant case.
The voir dire of a jury is important in any case but especially so where the state seeks to impose the death penalty. The nature of the penalty and the strong personal *421 convictions of many prospective jurors have resulted in voir dire proceedings unique to capital cases. Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968); Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973, 9 Ohio Ops.3d 26 (1978); Adams v. Texas, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980); Wainwright v. Witt, ___ U.S. ___, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985).
In Armstrong v. State, 214 So.2d 589 (Miss. 1968) this Court attempted to provide guidelines by which our trial courts could follow the dictates of Witherspoon:
The proper method of bringing the death penalty to the attention of the special veniremen is for the trial judge to inform them that they have been summoned as veniremen in a capital case and that a verdict of guilty could result in the infliction of the death penalty. The judge should then ask them if any member of the panel has any conscientious scruples against the infliction of the death penalty, when the law authorizes it, in proper cases, and where the testimony warrants it. If there are those who say that they are opposed to the death penalty, the trial judge should then go further and ask those veniremen, who have answered in the affirmative, whether or not they could, nevertheless, follow the testimony and the instructions of the court and return a verdict of guilty although that verdict could result in the death penalty, if they, being the judges of the weight and worth of the evidence, were convinced of the guilt of the defendant and the circumstances warranted such a verdict. Those who say that they could follow the evidence and the instructions of the court should be retained, and those who cannot follow the instructions of the court should be released. The mere fact that a venireman is opposed to the death penalty does not disqualify him as a juryman, if he can do his duty as a citizen and juror and follow the instructions of the court, and where he is convinced of the defendant's guilt he can convict him although the verdict of the jury may result in the death penalty's being inflicted upon the defendant.
214 So.2d at 593.
Although the United States Supreme Court has refined the Witherspoon decision in Adams, the issue remains the ability of the prospective juror to follow the instructions and the juror's oath. The proper method of determining whether the prospective juror can do that is still for the judge to follow the procedure outlined in Armstrong. Unfortunately that did not occur in the present case and that failure ultimately combined with some prospective jurors' reluctance to serve to create the difficulties we now face.
The Harrison County District Attorney conducted the majority of the death penalty voir dire, with the circuit judge participating only when the questions and responses of Mrs. Bounds became so tangled that everyone involved admitted to being confused. That problem notwithstanding, the groundwork for Mrs. Bounds' removal was laid long before any questions were asked of her.
When the voir dire began several jurors expressed the sentiment that they had conscientious scruples against the death penalty and could not vote to inflict it under any circumstances. The trial judge refused to excuse those jurors for cause and required the state to exercise peremptory challenges to them. It is abundantly clear from the record that his reason for doing so was because he believed that the jurors were simply claiming to have concientious scruples against the death penalty so that they could be released from jury service.[1] Confronted by what he believed to be insincere attestations of personal moral convictions, the trial court was unwilling to dismiss those jurors for cause even though their responses clearly indicated that they could *422 properly be so dismissed both under Witherspoon and Adams.
By the time Mrs. Bounds was voir dired the state had already been forced to use all of its peremptory challenges. As stated above, Mrs. Bounds' voir dire was lengthy and confusing. Nonetheless she positively stated several times that she could vote for the death penalty should the circumstances warrant it. Although her responses were at times equivocal, she was clearly qualified to be seated as a juror under the Adams and Witt criteria. See Fuselier, supra.
Because of Mrs. Bounds' equivocation the state sought to excuse her and complained that the trial court had erroneously forced it to use all of its peremptory challenges. The trial judge responded by saying:
Well, I think that's right. I made you use about five of them that didn't equivocate. Uh, I never had no idea that we'd run into this many.
The trial judge then directed the prosecutor to resume questioning Mrs. Bounds in an effort to get an unequivocable response. She again replied that she could vote for the death penalty. The state then again requested that she be dismissed for cause. The court then ruled as follows:
(BY THE COURT: (Interposing) I should have questioned them on this, I guess... ...
(BY [DISTRICT ATTORNEY]: (Unable to distinguish Mr. Necaise's remarks as the Court continued talking, at the same time.)
(BY THE COURT: ... ... but I never had no idea it was going to... ...
(BY [DEFENSE COUNSEL]: (Interposing) Disregarding the evidence... ...
(BY THE COURT: ... ... wind up in a mess like this. I'd hate to get a conviction and get it reversed because of this one woman. She can't make up her mind.
Well, let the record show that the Court is of the firm opinion that there was at least five, even though I think there's around nine challenges been used by the District Attorney for cause, either eight or nine, all right, there was eight of them that had said that they were against Capital Punishment.
And I think there was, uh, five of those that were unequivocally opposed to it and answered, in substance, if not even stronger language than the question set forth in the Witherspoon case, uh, from the United States Supreme Court, uh, that I should, at this point, allow him to challenge this lady for cause. She is totally indecisive. I think she is totally indecisive. She says one thing one time and one thing another.
The Court is of the opinion that it cheated the State by making him, uh, use, uh, by making the District Attorney use his peremptory challenges in at least five instances. And I'm going to allow it in this particular case.
(BY [DEFENSE COUNSEL]: Excuse her for cause?
(BY THE COURT: I'm going to excuse her.
(BY [DEFENSE COUNSEL]: Let me ask the Court this, is the Court of the opinion that, uh, that there has been a sufficient record... ...
(BY THE COURT: (Interposing) I'm not going to add any to his challenges.
(BY [DEFENSE COUNSEL]: Okay. All right.
(BY THE COURT: I'm not going to go back and give him five more. I'm going to excuse her for cause.
(BY [DEFENSE COUNSEL]: Okay. All right.)
(BY THE COURT: You can go, Mrs. Bounds, and call back tomorrow afternoon.
Although the route taken to Mrs. Bounds' dismissal was a circuitous one indeed, and most highly disfavored, it should be obvious to all that no prejudice occurred to the defendant Gray. The force and effect of the trial court's ruling was to correct an error he had committed in refusing to dismiss other jurors for cause after they had unequivocably stated that they could *423 not vote to impose the death penalty in any circumstance. Certainly the state is entitled to a jury that can follow the instructions and juror's oath. Adams, supra; Witt, supra. That being the case the trial court was correct when it recognized the error in its prior rulings and took affirmative action to correct that error. We have recognized in numerous cases that a trial court should be afforded the opportunity to correct any errors at trial by way of a motion for a new trial. House v. State, 445 So.2d 815, 819 (Miss. 1984); Read v. State, 430 So.2d 832, 838 (Miss. 1983); Johnson v. State, 404 So.2d 553, 556 (Miss. 1981); Tribbett v. State, 394 So.2d 878, 880-81 (Miss. 1981).
There is no logical reason not to allow the trial court in this situation to correct its erroneous ruling prior to the empanelling of the jury and termination of trial. Notions of judicial economy make it clear that the trial court should be allowed to recognize and correct its error early in the proceedings, especially where as here, there could have been no possible prejudice to the defendant. That being the case, we find no merit to Gray's final assignment of error.
Finally, we have closely examined the record in the instant case and unequivocably find that Gray's murder of Wojcik warranted the death penalty. A comparison of this case with our cases decided after Jackson v. State, 337 So.2d 1242 (Miss. 1976), in which the death penalty has been imposed and upheld reveals that such penalty is neither wanton, freakish, excessive, nor disproportionate to the sentences imposed in those cases. (See Appendix "A") His execution would be consistent and even handed with all the post-Jackson cases previously affirmed by us.
Based on all of the foregoing, we hereby affirm DAVID RANDOLPH GRAY'S verdict of guilty and sentence of death. That sentence is to be carried out in the manner prescribed by law on the 26th day of June, 1985.
AFFIRMED.
AS TO PART I: All Justices concur.
AS TO PART II: WALKER and ROY NOBLE LEE, P.JJ., and HAWKINS, PRATHER and ANDERSON, JJ., concur as to Part II.
PATTERSON, C.J., and SULLIVAN and ROBERTSON, JJ., dissent as to Part II.

APPENDIX "A"
DEATH PENALTY CASES AFFIRMED BY THIS COURT:
Johnson v. State, No. 55,265, decided May 8, 1985, (not yet reported);
Cabello v. State, 471 So.2d 332 (Miss. 1985);
Jordan v. State, 464 So.2d 475 (Miss. 1985);
Wilcher v. State, 455 So.2d 727 (Miss. 1984), and 448 So.2d 927 (Miss. 1984);
Stringer v. State, 454 So.2d 468 (Miss. 1984);
Billiot v. State, 454 So.2d 445 (Miss. 1984);
Dufour v. State, 453 So.2d 337 (Miss. 1984);
Neal v. State, 451 So.2d 743 (Miss. 1984);
Booker v. State, 449 So.2d 209 (Miss. 1984);
Caldwell v. State, 443 So.2d 806 (Miss. 1983);
Irving v. State, 441 So.2d 846 (Miss. 1983) and 361 So.2d 1360 (Miss. 1978);
Tokman v. State, 435 So.2d 664 (Miss. 1983);
Leatherwood v. State, 435 So.2d 645 (Miss. 1983);
Hill v. State, 432 So.2d 427 (Miss. 1983);
Pruett v. State, 431 So.2d 1101 (Miss. 1983);
Gilliard v. State, 428 So.2d 576 (Miss. 1983);
Evans v. State, 422 So.2d 737 (Miss. 1982);
*424 King v. State, 421 So.2d 1009 (Miss. 1982);
Wheat v. State, 420 So.2d 229 (Miss. 1982);
Smith v. State, 419 So.2d 563 (Miss. 1982);
Johnson v. State, 416 So.2d 383 (Miss. 1982);
Edwards v. State, 413 So.2d 1007 (Miss. 1982);
Bullock v. State, 391 So.2d 601 (Miss. 1980);
Reddix v. State, 381 So.2d 999 (Miss. 1980);
Jones v. State, 381 So.2d 983 (Miss. 1980);
Culberson v. State, 379 So.2d 499 (Miss. 1979);
Gray v. State, 375 So.2d 994 (Miss. 1979);
Jordan v. State, 365 So.2d 1198 (Miss. 1978);
Voyles v. State, 362 So.2d 1236 (Miss. 1978);
Washington v. State, 361 So.2d 61 (Miss. 1978);
Bell v. State, 360 So.2d 1206 (Miss. 1978).
DEATH PENALTY CASES REVERSED AS TO PUNISHMENT AND REMANDED FOR RESENTENCING TO LIFE IMPRISONMENT:
Edwards v. State, 441 So.2d 84 (Miss. 1983);
Dycus v. State, 440 So.2d 246 (Miss. 1983);
Coleman v. State, 378 So.2d 640 (Miss. 1979).
DEATH PENALTY CASES REVERSED AS TO PUNISHMENT AND REMANDED FOR A NEW TRIAL ON SENTENCING PHASE ONLY:
Mhoon v. State, 464 So.2d 77 (Miss. 1985);
Cannaday v. State, 455 So.2d 713 (Miss. 1984);
Wiley v. State, 449 So.2d 756 (Miss. 1984);
Williams v. State, 445 So.2d 798 (Miss. 1984).
SULLIVAN, Justice, dissenting:
The majority admits that it would be error for the trial judge to excuse venire member Bounds for cause since "she was clearly qualified to be seated as a juror under the Adams and Witt criteria". Ante at 421. We are told that her excusal did not violate Gray's right to an impartial jury because the trial judge was actually correcting a prior erroneous ruling which deprived the state of a peremptory challenge.
With all deference to the majority, it contradicts the trial judge's very words to rule that Bounds was removed by a peremptory challenge. Furthermore, the law does not sanction the attempt to exercise leftover peremptory challenges to cure a violation of a capital defendant's right to trial by an impartial jury.
The record could not more plainly reflect that the basis for excusing juror Bounds was not a peremptory challenge, but a challenge for cause. At the conclusion of the colloquy quoted by the majority, ante at 422-423, the trial judge said: "I'm not going to add any to his challenges ... I'm not going to go back and give him five more. I'm going to excuse her for cause." (TR at 555). Whatever may have been the "force and effect" of the trial court's ruling, he plainly stated that he was excluding venire member Bounds for cause.
The majority makes an appealing argument that the trial judge properly corrected a prior erroneous ruling concerning previous jurors who stated that they could not vote for the death penalty under any circumstances. The reason these jurors were originally excused, according to the majority, was that the trial judge believed that their answers were insincerely given in order to be released from jury service. If in fact these jurors were concealing an ability to serve on a capital murder case, then they could not any more be excused for cause consistent with Adams and Witt than Mrs. Bounds.
The underlying reasoning of the majority opinion is that excusal of juror Bounds for cause was harmless error since the trial judge, in effect, gave the state back a *425 previously exercised peremptory challenge. The problem is that Davis v. Georgia, 429 U.S. 122, 97 S.Ct. 399, 50 L.Ed.2d 339 (1976), requires us to conclude that dismissals for cause cannot be sanctioned as "harmless error", regardless of whether the state, at trial, could have peremptorily challenged the same juror. See Burns v. Estelle, 592 F.2d 1297 (5th Cir.1979), adhered en banc 626 F.2d 396 (5th Cir.1980), Moore v. Estelle, 670 F.2d 56 (5th Cir.1982), Hance v. Zant, 696 F.2d 940, 956 (11th Cir.1983); Barfield v. Harris, 540 F. Supp. 451, 465 (ED.N.C. 1982); Keeten v. Garrison, 578 F. Supp. 1164, 1190 (WD N.C. 1984); Chandler v. State, 442 So.2d 171, 175 (Fla. 1983); Blankenship v. State, 280 S.E.2d 623, 624 (Ga. 1981); overruling Alderman v. State, 241 Ga. 496, 246 S.E.2d 642 (1978); Grijalva v. State, 614 S.W.2d 420 (Tx.Cr. App. 1980) en banc overruling Chambers v. State, 568 S.W.2d 313 (Tx.Cr.App. 1978); People v. Velasquez, 26 Cal.3d 425, 162 Cal. Rptr. 306, 606 P.2d 341 (1980); In Re Anderson, 69 Cal.2d 613, 73 Cal. Rptr. 21, 447 P.2d 117 (1968).
The case law holding that there can be harmless error in Witherspoon cases, such as when the state has not used all of its peremptory challenges, represents extremely doubtful authority, as it fails to follow the absolute rule of reversal mandated by Davis v. Georgia, referred to by Justice Rehnquist in his dissent as a per se rule. Davis announces a clear rule mandating reversal and the following cases which fail to adhere to it are ignoring the authoritative construction of the United States Supreme Court of the Federal right to trial by an impartial jury. State v. Nicholson, 437 So.2d 849 (La. 1983); Gall v. Commonwealth, 607 S.W.2d 97 (Ky. 1980); State v. Johnson, 298 N.C. 355, 259 S.E.2d 752 (1979); People v. Moore, 42 Ill.2d 73, 246 N.E.2d 299 (1969).
In conclusion, there can be no doubt that juror Bounds was clearly qualified to be seated as a juror under the Adams and Witt criteria. The majority errs in holding that the trial judge did not excuse her for cause. Its attempts to justify the trial judge's error amount to a retroactive application of a peremptory challenge, clearly an unacceptable and unwise course to pursue in view of the clear authority to the contrary. I would rule that the trial court erred in excluding juror Bounds for cause, and this error requires reversal of Gray's death sentence for a new sentencing trial. See Granviel v. Estelle, 655 F.2d 673 (5th Cir.1981). I would adhere to the ruling in Davis v. Georgia, that a violation of Adams and Witt is per se grounds for reversal, and cannot be excused as harmless error.
PATTERSON, C.J., and ROBERTSON, J., join in this dissent.
NOTES
[1] This certainly highlights the problems that can be encountered when the trial court rules on each juror immediately after that juror's voir dire and in the presence of the other prospective veniremen. Jurors who wish to be excused are quick to learn what responses will get them excused. Such a procedure is not good practice and should be avoided.