514 So.2d 767 (1986)
Mark Anthony PARKER
v.
STATE of Mississippi.
No. 56287.
Supreme Court of Mississippi.
July 16, 1986.
Rehearing Denied November 12, 1987.
William E. Tisdale, Sekul, Hornsby & Teel, Keith Pisarich, Cavanaugh & Pisarich, Biloxi, for appellant.
*768 Edwin Lloyd Pittman, Atty. Gen. by Charles W. Maris, Jr., Sp. Asst. Atty. Gen., Jackson, for appellee.
En Banc.
ROBERTSON, Justice, for the Court:

I.
For far too many years the people of this state have paid dearly for their racial prejudices, animosities, hatreds. A not insignificant part of that price was exacted on the evening of April 26, 1983, in Biloxi, Mississippi, when the white and black occupants of two moving vehicles, apparently not knowing and having never before seen one another began hurling and returning racial epithets at each other. In the end one was engulfed in flames and died an agonizing lingering death while the other has been convicted of manslaughter.
This appeal from the second trial on a murder indictment  the first having resulted in a hung jury  questions whether the trial court may have deviated from the directives of the United States Supreme Court in Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). Because the trial judge refused to allow the Defendant to present testimony that another had confessed, even bragged about, throwing the fatal match  and thus to impeach the other's subsequent recantation, Chambers mandates reversal.

II.

A.
In the middle of evening rush hour traffic on April 26, 1983, two automobiles were traveling in a easterly direction on Division Street in Biloxi, Mississippi. A red Subaru was driven by Karl Thompson and occupied by Mark Anthony Parker and T.C. Carter, all black persons. Parker was the Defendant below and is the Appellant here. The driver and sole occupant of a blue Toyota was Darrell Jay Jones, who was white.
The occupants of the two vehicles engaged in a fatal altercation at the corner of Caillavet Street and Division Street in Biloxi, Mississippi. In the end the driver of the blue Toyota, Darrell Jay Jones, was engulfed in flames and jumped from his car, a living torch, and proceeded to burn until witnesses rolled him in a blanket and subdued the fire with a fire extinguisher. Jones died sixteen days later and Mark Anthony Parker, one of the occupants of the other car, was charged with murder.
There were numerous eyewitnesses to various portions of the ultimately fatal altercation. Billy Ray Ainsworth, an air conditioning and refrigeration man on his way home from work, stopped at Cheaper's Chicken[1] at the corner of Caillavet and Division Streets and was the second car in line at the drive-in window when he heard an argument and directed his attention to two cars in front of him at the traffic light.
He heard "fussing or complaining, yelling and screaming" and saw some object being thrown between the two cars. He saw the occupant of the blue car (Jones) get out of his car and walk over to the car with the three occupants and begin swinging through the window on the passenger side of the car. According to Ainsworth, the one in the back seat (Mark Parker) was the first one out of that car. Parker and Jones were swinging at each other and shouting racial slurs and then they locked up and started wrestling on the ground. At this point, according to Ainsworth, the red car, with only the driver in it, pulled onto Caillavet Street and parked. After the driver parked the car he got out and just stayed by the car.
At this point Jones, whom Ainsworth claims "looked like he started the fight", got up from the wrestling and headed back to his car. One of the black men [Parker] began banging on the passenger side of the blue car and reaching through the window at Jones. The man could not reach Jones from the passenger side and he started around the car to get to him at the driver's side. On his way around the car he tripped *769 on an object which Ainsworth identified as the one they had been throwing at each other in the very beginning, a plastic jug of gasoline. When he came back to the passenger side, he slung it in the car.
Ainsworth saw the man [Parker] bend down, make an arching motion between his legs, then rise up and throw a lighted book of matches into the window of the blue Toyota, Jones' car. The car ignited immediately and blew the man back away from it.
Joycelyn Marie Hebert and Cheryl Nehlig were the occupants of the car in front of Ainsworth at the drive-in window. Cheryl had put her coke on the dashboard and when the car pulled out from the drive-up window, the coke had spilled. While cleaning up the spilled drink, a "bunch of hollering" drew her attention. Jocelyn saw a black [Parker] and a white [Jones] throwing punches at each other. Another boy started throwing gas out of a plastic bottle on the white boy.
According to Jocelyn the white boy went back to his car and hollered that he had had enough and got into the car and closed the door. One of the black boys came around to the passenger side and was standing by the window of the blue car, "It looked like he was throwing gas in the car", the white boy was throwing his arm out at the black boy. As the car and the boy in it caught on fire, the black fellow hollered "Burn, mother fucker, burn".
The white boy got out of the car and rolled on the ground and then ran up to Jocelyn, "All I could see was that boy burning right in front of me and he was crying and he was screaming for help  he was hollering to help him and I couldn't do anything. I didn't have anything to help him." At this point someone threw a blanket over him and someone else came with a fire extinguisher and put him out.
Jocelyn's friend, Cheryl Ann Nehlig, was driving the car when the two stopped at Cheaper's. She was standing outside the car attempting to clean up the spilled coke when she heard the two cars pass her and could hear the arguing among the individuals in the cars. She saw the white male (Jones) get out of his car and walk over to the passenger side of the front seat of the red car and put his hands on the window and stoop down and say something to the man in the car and then turn around and go back to his own car. The black male (Parker) that was sitting in the back seat on the passenger side followed him back over to his car and started fighting.
The two began arguing and fighting and Parker took Jones and threw him across the front of the car. Jones got up and threw a karate kick at Parker and the two went down on the ground and began fighting on the ground. Parker was beating Jones' head on the ground and the smaller black guy went over to the two with a plastic bottle of gas and began pouring it on the length of Jones' while Parker held him down. When they got up, Jones said, "I've had enough, I'm leaving," and got in his car and shut the door.
Parker approached the passenger side of Jones' car with a jug of gas and was throwing what was left of the gas into the car and Jones was making gestures with his hands trying to stop him from pouring the gas. "The next thing I saw was the Defendant looked like he had a match in his hand and as to strike and just before he struck he said, `Burn, you mother fucker, burn.' And, the next thing the car just burst into flames."
Nehlig said that Parker was kneeling down a bit and used his right arm for throwing the match in after he struck it. At this point Jones got out of the car:
he started running toward my friend and I and he started hollering, `Help me, help me,' and he rolled on the ground and got back up and just kept coming toward us and he was so close that you could reach out and touch him ... His whole body was on fire. The flames shot up. He looked three times taller than he was and his whole face  just like his bones  flames in his face, you couldn't see anything else. All between his legs and his whole body.
Brent Hunter was working at the Cheaper's/Popeye's on the day of the incident. *770 He knew Parker, Thompson and Carter and watched the fight from the window of the fast food restaurant. He saw Carter and Thompson jump into the fight and then after Parker began seriously fighting, the other two just stood around and watched. When Jones got back into his car, Hunter saw him throw the gas container out the window of the car and saw Parker throw it back in. The two were tussling over it when the car burst into flames. At this point Thompson and Carter were not standing by the vehicle but were further back closer to the restaurant. Hunter testified that he did not see a flame or anything else in Parker's hand and that when the fire first started, Parker jumped back away from the car and, "at first he went around to help the guy and then he ran". Carter also ran and Thompson got in the car and left. Hunter got the fire extinguisher out of the store and helped put out the fire.
Four other persons  Jerald Woelk, Charlotte Peterman, and her mother, Della Sinquefield, and Daniel Hokamp  witnessed the incident and in rough measure gave testimony corroborating that of the witnesses described above.

B.
Procedurally, this criminal prosecution had its genesis on May 27, 1983, when the Grand Jury of Harrison County, Mississippi, returned an indictment charging Mark Anthony Parker with the murder of Darrell Jay Jones. Some four months later the matter was called for trial at the conclusion of which the jury announced that it could not agree upon a verdict. On September 30, 1983, the trial judge declared a mistrial.
The matter was called for trial a second time and on May 25, 1984, the Circuit Court jury found Parker guilty of the lesser-included offense of manslaughter. Thereafter the Circuit Court sentenced Parker to the custody of the Mississippi Department of Corrections for a term of twenty (20) years. Miss. Code Ann. § 97-3-25 (1972). Following the usual post-trial motions, Parker has perfected his appeal.

III.
Parker argues first that the State failed to establish the origin of the fire that killed Darrell Jay Jones and that, therefore, he is entitled to an acquittal as a matter of law.
As noted above, testimony which implicated Parker in igniting the fire was substantial. Witnesses Ainsworth and Nehlig both testified that they saw the flame in Parker's hand. Witness Herbert testified that Parker was on the passenger side of the car at the window and while she did not see a flame, the fire began on the passenger side and moved quickly to engulf Jones. This was sufficient.
Under our system, once a jury has returned a verdict of guilty in a criminal case that verdict must be allowed to stand if there appears in the record substantial, credible evidence consistent with it. Considering the evidence in the light most favorable to the verdict, if we cannot say that no reasonable hypothetical juror could find beyond a reasonable doubt that the defendant was guilty as charged, we have no authority but to affirm. See, e.g., Robinson v. State, 473 So.2d 957, 964 (Miss. 1985); Pearson v. State, 428 So.2d 1361, 1363 (Miss. 1983); Gathright v. State, 380 So.2d 1276, 1278 (Miss. 1980). No error lies here.

IV.
Parker protests the admission of the testimony of Officer Timothy P. Lamey that when he arrived approximately two minutes after receiving the call, he asked the victim, Jones, what happened and Jones responded, "I can't believe they set me on fire." The trial judge held this comment admissible under the res gestae exception to the hearsay rule. Parker argues that, in order for a statement to qualify under the res gestae exception, it must be (1) a startling event that renders reflected thought inoperative and (2) a spontaneous reaction to the occurrence and not a result of reflective thought. Parker argues that because the statement was made in response to the question, "What happened," that it was by definition not sufficiently spontaneous to qualify for admission under the res gestae exception.
*771 In Fuson v. State, 413 So.2d 734, 735 (Miss. 1982), we held admissible under the res gestae exception to the hearsay rule an almost identical statement. In that case the defendant had shot his wife and she was lying in the street when the constable arrived. He asked her, "Well, who shot you?" She answered, "Chuck [her husband] shot me." These statements were held admissible under both the dying declaration and res gestae exception to the hearsay rule. In the case at bar the victim lived for sixteen days. Therefore, the dying declaration exception has no application. See Clark v. State, 398 So.2d 229, 230 (Miss. 1981). But the admission as res gestae was proper.[2] If the conversation had taken place at a time less closely connected with the crime  as was the case in Thompson v. State, 339 So.2d 982, 983 (Miss. 1976) wherein the witness was with the victim for 30 minutes before asking him if he knew who did it  the statement would not have been res gestae.
Under the circumstances the statement was properly admitted. The assignment of error is denied.

V.
Because Parker stipulated to the identity of the deceased and the cause of death, he argues that under Sharp v. State, 446 So.2d 1008 (Miss. 1984) the photographs should not have been admitted into evidence. Sharp holds:
Photographs of the victim should not ordinarily be admitted into evidence where the killing is not contradicted or denied in the corpus delicti and the identity of the deceased has been established. Shearer v. State, 423 So.2d 824, 827 (Miss. 1982); see also Williams v. State, supra. Additionally, gruesome photographs which have no evidentiary purpose and which only arouse the emotions of a jury should not be admitted... .
446 So.2d at 1009.
The photographs, S-4 through S-7, show the victim as rescuers attempt to cut his clothes from his body after the fire was put out.
The record reflects that State Exhibit 4 was admitted along with State Exhibits 1, 2 and 3 during the direct testimony of Tim Lamey, and State's Exhibit 7 was introduced during the cross-examination of Witness Daniel Hokamp and admitted for identification purposes. State's Exhibits 5 and 6 were never formally received into evidence. Some "probative value" is the only requirement needed to buttress a trial judge's decision to allow photographs into evidence. Johnson v. State, 476 So.2d 1195, 1206 (Miss. 1985); Swanier v. State, 473 So.2d 180, 185 (Miss. 1985); Cabello v. State, 471 So.2d 332, 341 (Miss. 1985); Holliday v. State, 455 So.2d 750, 752 (Miss. 1984); Billiot v. State, 454 So.2d 445, 460 (Miss. 1984). Both pictures admitted into evidence have other people present therein and are therefore descriptive of events described at trial. The trial judge was within his discretion in admitting these pictures into evidence and no error lies here.[3]

VI.
Parker's dispositive assignment of error is that the trial court
erred in overruling Appellant's motion for a transcript of the first trial and erred in refusing to allow the jury to hear the testimony of Alicia Rainey.
The impact of this error, we are told, was that the jury decided Parker's fate unaware of a prior statement by T.C. Carter that he, Carter, threw the match that ignited the fire that killed Darrell Jay Jones. The assignment is undergirded by Chambers *772 v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973) which subjects our rules of evidence to substantial due process restrictions.
At Parker's first trial  which ended in a mistrial as the jury was unable to agree upon a verdict  T.C. Carter, Parker's young companion, appeared and testified. Carter disputed the testimony of Parker in several respects. Specifically, Carter was asked if he ever told Alicia Rainey that he, Carter, had started the fire. Carter denied making any such statement. Still at the first trial, Parker's counsel then called Alicia Rainey who impeached Carter on this critical point. Alicia was fourteen years old at the time, as was Carter. She testified that Carter told her about the incident at a dance at the Division Street Community Center. She asked Carter what he had to do with the incident and he told her he had dropped the match which ignited the gasoline.
I asked him [Carter] about what had happened because I had heard a lot of things about it. I asked him and he said that Mark [Anthony Parker] was fighting with somebody and then I asked what did him and Karl have to do with it, he said they got out of the car, he said Karl had a gas  a jug with gas  and I asked what did he do, he said he dropped the match and ran in front of Church's Chicken. He said he [Carter] was about to light a joint and he dropped the match and ran in front of Church's Chicken. Then he said, `The mother fucker should have died because he slapped him', and everybody was calling him the flamethrower, he hollered out, `Don't call me the flamethrower, call me the destroyer.'
By the time of the second trial, T.C. Carter was residing in Germany with relatives. Defense counsel had a subpoena issued for Carter, only to have it returned "Not Found". Carter's mother appeared and testified that he was in Germany with his stepmother. Obviously, T.C. Carter was unavailable for testimony.
In the end the primary difference between Parker's first trial  which ended in a hung jury  and his second trial  which resulted in a manslaughter conviction  was the presence of and testimony of T.C. Carter and Alicia Rainey at the first trial, but the absence of Carter and the exclusion of the testimony of Rainey at the second.
On October 10, 1983  some ten days following the declaration of a mistrial at Parker's first trial  and some seven months prior to his second trial, Parker filed a motion for a transcript of the first trial, alleging "that a full transcript of the first trial would be an essential and valuable tool at the second trial of this cause". It is not clear, however, that the trial judge ever ruled upon the motion or, for that matter, that Parker's counsel affirmatively sought a ruling prior to the second trial. The issue of the transcript of the first trial arose during cross-examination of State Witness Cheryl Nehlig when Parker's counsel requested that examination of the witness be continued until the next morning and that the court reporter provide him with a transcript prior to the completion of his cross-examination. The record reflects that the tape recording of the testimony of Witness Nehlig at the first trial was made available to counsel and was used in an attempt to impeach her.
The testimony of T.C. Carter from the first trial was certainly available for use in the second trial in the same form as Nehlig's.
The critical point at trial was Parker's attempt to introduce into evidence the prior testimony of T.C. Carter. This, of course, was to be followed by the live testimony of Alicia Rainey who would impeach Carter by relating to the jury the statement quoted above which she attributes to Carter.
Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973) arose in a similar factual setting. In Chambers a witness named McDonald was said to have made a prior statement confessing to the crime. The defense had three witnesses who were prepared substantially to impeach McDonald's subsequent recantation. Chambers held that the due process clause prohibited this state from enforcing its voucher and hearsay rules so as to preclude the defense, first, from calling McDonald *773 as a witness and, second, from impeaching his testimony with the three additional witnesses. The differences between Chambers and the case at bar are twofold and minor: In Chambers the defense offered McDonald as a live witness while here Carter is offered via the former testimony exception to the hearsay rule. Second, in Chambers the defense had three witnesses with whom to impeach McDonald while here the defense has only one witness with whom to impeach Carter's recantation.
Parenthetically, it should be noted that at Parker's first trial the Chambers procedure appears to have been followed in its entirety. There Carter appeared as a live witness called by the defense and made his recantation. On the authority of Chambers, Parker's counsel was then allowed to call Rainey who gave testimony that Carter had said that he threw the match that started the fire, referring to the statement by Carter quoted above.
The testimony of T.C. Carter from the first trial was available. Whether that testimony was available in transcribed form or tape recorded form need not detain us. Our question is whether that testimony is admissible. As argued by Parker in his brief, the testimony comes within the former testimony exception to the hearsay rule. See Smith v. State, 247 So.2d 705, 706 (Miss. 1971); Lee v. State, 124 Miss. 398, 416, 86 So. 856, 858 (1921).
The foremost requirement of the former testimony exception to the hearsay rule is that the witness or declarant be unavailable. Williams Yellow Pine Co. v. Williams, 187 Miss. 425, 432, 193 So. 1, 2 (1940); Owens v. State, 63 Miss. 450, 452-53 (1886). Dicta in some of our cases have suggested that in a criminal trial the out-of-court-declarant must actually have died in order to be declared "unavailable", Smith v. State, 247 So.2d 705, 706 (Miss. 1971), although surely this overstates the point. Here the declarant, T.C. Carter, was in West Germany at the time of the trial. It would defy common sense to hold that such a witness was "available" for present purposes.
The strictures of the former testimony exception, as it existed at the time of this trial[4], are best summarized in the opinion of Judge Henry Lee Rogers in Jolly v. State, 269 So.2d 650, 654 (Miss. 1972). Those requirements are (1) the former testimony must have been given under oath; (2) the party against whom the testimony is offered must have had a reasonable opportunity for cross-examination; (3) there must have been an identity of the parties in the former trial and in the trial in which the testimony is offered; (4) there must have been an identity of the issues; and (5) the witness must be unavailable at the time of the second proceeding. Since the trial at issue here is a retrial of the charges under the same indictment, it seems clear that the Jolly requisites for the former testimony exception are met. The testimony of T.C. Carter from the first trial, whether in transcribed or tape recorded form, was admissible at the second trial. This is so procedurally by virtue of the former testimony exception to the hearsay rule. Chambers declares it so substantively.
Turning next to the question of whether Parker could employ Alicia Rainey to impeach T.C. Carter's recantation, we find the point again covered by Chambers. It will be recalled that in Chambers, McDonald had confessed to the crime and then recanted.[5] The defense had three witnesses  Hardin, Turner and Carter  each of whom was prepared to impeach McDonald's recantation. In the case at bar T.C. Carter finds himself in the shoes of Hardin, Turner and Carter in the Chambers case. Chambers holds that the defense may not be precluded from calling *774 such witnesses for the purposes of impeaching a witness called by the defense. This is particularly so where the tenor of the entire attempt by the defense was to place before the jury the confession of someone else to the crime charged under the indictment. Here the whole tenor of the defense efforts was to place before the jury T.C. Carter's admission that he threw the match which started the fire that killed Darrell Jay Jones.
The trial judge committed error when he refused to allow the defense to offer into evidence the prior testimony of T.C. Carter and then to allow the defense to call Alicia Rainey to impeach Carter's recantation. The nature and history of the case makes it apparent that the error is of reversible proportions. The question of who was the aggressor, Darrell Jay Jones or Mark Anthony Parker, was hotly disputed at trial. The fact that Jones was white and Parker was black and that all agreed that each was hurling racial epithets at the other further clouded the picture. In this setting on September 30, 1983, with Parker on trial for murder, and with the jury having before it the evidence that T.C. Carter had admitted and even bragged about having thrown the fatal match, a hung jury and mistrial resulted. Almost eight months later, upon retrial, and without the critical testimony from T.C. Carter and Alicia Rainey, the jury was still in some doubt, as is evidenced by the "compromise" manslaughter verdict. Compared with the first trial and considered in the context of the proof, we consider that the exclusion of the Carter-Rainey testimony from the second trial undermines confidence in the result.
We emphasize that this case is distinguishable from three of our post-Chambers decisions. Fermo v. State, 370 So.2d 930, 934 (Miss. 1979); Lee v. State, 338 So.2d 399, 402 (Miss. 1976) and Thompson v. State, 309 So.2d 533, 534-35 (Miss. 1975). In each of those three cases the so-called confession of the third party  the party in the petition equivalent to Carter here  came from a person who was not present to testify at trial. Accordingly, the defense in each instance sought to introduce the hearsay version of the so-called confession under the declaration against penal interest exception to the hearsay rule. In each of those cases the person who gave the so-called confession was not a party to the proceedings nor was that person's testimony available in any form. Typical of the Thompson-Lee-Fermo holdings is the statement in Fermo that:
We hold, therefore, that ... where the declarant is not available his out of court declarations against penal interest are not sufficiently trustworthy to justify the court in making an exception to the hearsay rule.
370 So.2d at 934.
As indicated above, Parker's first trial was legally synonymous with Chambers. Carter was available at Parker's first trial, as McDonald had been available at Chambers' trial. Following the Chambers procedure, Parker was allowed to impeach Carter's recantation through Rainey's testimony.
The precise question then posed is whether Parker's second trial is taken out of Chambers because Carter's testimony is available then under the former testimony exception to the hearsay rule rather than via Carter's appearance. Rainey's testimony, of course, in both instances would be substantially the same  and we are somewhat hemmed in by the fact that that testimony was admitted at the first trial.
Thompson, Lee and Fermo all proceed on the premise that the confession was not admissible via the declaration against penal interest exception to the hearsay rule.[6] Here, there is an independent basis for the confession's admissibility. With Carter's testimony wholly admissible under the former testimony exception, Rainey's testimony is admitted as impeachment of Carter's *775 testimony. While conceding that the point is close and that the underlying rationale for distinguishing this case from Thompson, Lee and Fermo is not wholly satisfactory, we find a dominant pronouncement of law in this area, that emanating from Chambers, and find this case sufficiently within the scope and policy of Chambers that we must reverse.
The judgment that Mark Anthony Parker stand convicted of the crime of manslaughter is reversed and this case is remanded to the Circuit Court for a new trial in all respects consistent with this opinion.
REVERSED AND REMANDED
ROY NOBLE LEE, P.J., and PRATHER, SULLIVAN and ANDERSON, JJ., concur.
WALKER, C.J., HAWKINS, P.J., and DAN M. LEE and GRIFFIN, JJ., dissent by written opinion.
DAN M. LEE, Justice, dissenting:
I respectfully dissent from the majority's opinion in this case, which would allow the admission of T.C. Carter's prior statement that he was the person who threw the match on Darrell Jay Jones, for several reasons. First, I do not believe that the rules of evidence of Mississippi, either as they existed at the time of trial, or as they have been since amended, allow the admission of this type of hearsay testimony. Second, the rationale of Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), applies only to the limited circumstances of that case, and would be improperly applied here. Finally, this testimony, in my opinion, represents precisely the type of uncorroborated, inherently unreliable hearsay that the rules are designed to prevent from being presented to the jury.
Carter's testimony amounted to a confession that he was, in fact, guilty of the killing of Jones. It was a classic declaration against penal interest. For many years, Mississippi did not recognize this exception to the hearsay rules  we only recognized the declaration against pecuniary interest. Forrest County Coop. v. McCaffrey, 253 Miss. 486, 176 So.2d 287 (1965); Brown v. State, 99 Miss. 719, 55 So. 961 (1911). This was the state of the law in Mississippi when we decided Chambers v. State, 252 So.2d 217 (Miss. 1971). The United States Supreme Court overruled that decision in Chambers v. Mississippi, supra, holding that the declarant's [McDonald's] testimony should be admitted because:
Donald was present in the courtroom and had been under oath... . The availability of McDonald significantly distinguishes this case from the prior Mississippi precedent, Brown v. State, supra, and from the Donnelly-type situation, since in both cases the declarant was unavailable at the time of the trial.
(410 U.S. at 301, 93 S.Ct. at 1049, 35 L.Ed.2d at 312).
Since the decision in Chambers, we have held that the declaration against penal interest exception to the hearsay rules applies only when the declarant is present at trial. Fermo v. State, 370 So.2d 930 (Miss. 1979); Lee v. State, 338 So.2d 399 (Miss. 1976); Thompson v. State, 309 So.2d 533 (Miss. 1975). The reasons for this requirement are obvious. The exception to the hearsay rule is made because the seriousness of exposing oneself to criminal liability is believed to outweigh the potential for unreliability traditionally associated with hearsay. However, if the declarant has "confessed" and disappeared, it can hardly be said that the statement was made with much appreciation of the possible consequences.
The hazard he assumed was not, therefore, one of very great gravity, especially as his running away on being released goes strongly to show that ... he did not intend to incur any decided risk, and was ready to recant his confession as soon as it had served its purpose or exposed him to any great peril. (Brown, 99 Miss. at 729, 55 So. at 962).
Furthermore, when the declarant is not present at trial, he cannot be questioned about the statement or its movitation. Additionally, the absence of the declarant raises the possibility of collusion between the *776 defendant who is offering the out-of-court statement as exculpation, and the out-of-court (and out-of-harm's-way) declarant. The Chambers court recognized this danger, as posed in the following hypothetical:
A could be charged with the crime; B could tell C and D that he committed the crime; B could go into hiding and at A's trial C and D would testify as to B's admission of guilt; A could be acquitted and B would return to stand trial; B could then provide several witnesses to testify as to his whereabouts at the time of the crime. The testimony of those witnesses along with A's statement that he really committed the crime could result in B's acquittal. A would be barred from further prosecution because of the protection against double jeopardy. No one could be convicted of perjury as A did not testify at his first trial, B did not lie under oath, and C and D were truthful in their testimony... . Obviously, B's absence at trial is critical to the success of the justice-subverting ploy. (410 U.S. at 301, 93 S.Ct. at 1049, 35 L.Ed.2d at 312, N. 21).
Rule 804(b)(3) of the new Mississippi Rules of Evidence, effective January 1, 1986, does not apply to this case. However, it is worth noting, primarily because of its requirement that "A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement."
Thus, this testimony would fail under the new rules or the old as a declaration against penal interest. Under the old rules, it would fail because T.C. Carter was not present at trial. Under the new rules, it would fail because the testimony was not corroborated. Indeed, the testimony of all of the eyewitnesses to the crime refutes this so  called "confession", and states that Parker was actually the man who threw the match into Jones' car.
The majority's opinion would have this testimony admitted into evidence on the basis of its falling within the former testimony exception to the hearsay rules. Conversely to the declaration against interest exception  which requires the presence of the declarant  the former testimony exception requires his absence, in fact, his unavailability. As the testimony is clearly hearsay, its proponent has the burden of showing that it is deserving of admission, and the requirement for admission is that the declarant be unavailable to testify.
Our prior cases have held that unavailability, in this context, means dead or incompetent. Justice Robertson characterizes this language as "dicta." I do not agree. Consider the following cases:
It is well established that the testimony of a deceased witness, given under oath in a judicial proceeding between the same parties on the same issue, is competent, both in civil and criminal cases, for either party, when the party against whom the testimony is offered had opportunity to cross-examine the witness on the former proceeding. [citations omitted]
But whatever may be the rule in civil actions as to the admission of evidence to prove what was sworn by a witness on a former trial between the same parties when such witness is alive but has removed [himself] from the state, or is beyond the jurisdiction of the court, such evidence is excluded on criminal trials.
(Owens v. State, 63 Miss. 450, 452-53 (1886)).
In the trial of any case where the testimony has been taken and transcribed by the official reporter of the court in which the case was tried, such transcribed testimony is admissible only when such witness giving the testimony has become mentally or physically incompetent and incapable of testifying on a retrial of a case, or is dead.
The proof in this record disclosed that High "Sonny" McInnis was a resident of Atlanta, Georgia, and was neither mentally nor physically incompetent to testify and was living at the time of the second trial. Mere absence from the jurisdiction of the court, as was evident in this cause, does not meet the test provided by the statute.
(Smith v. State, 247 So.2d 704 (Miss. 1971)).
*777 Jolly v. State, 269 So.2d 650 (Miss. 1972), which is cited in the majority opinion, does suggest that temporary absence from the jurisdiction qualifies as "unavailability." However, the opinion was merely stating the criteria from McCormick's treatise on evidence, and not necessarily stating the law in Mississippi. Furthermore, the witness in Jolly had died prior to trial, so this criteria was not even an issue in the case. Clearly, this is "dicta."
I would not hold that prior testimony is inadmissible unless the witness is dead or incompetent at the time of trial. However, I would hold that "unavailability" means more than mere absence from the jurisdiction. Rule 804(a)(5), Miss.R.Evid. includes as a definition of "unavailability" the situation where the declarant "Is absent from the hearing and the proponent of his statement has been unable to procure his attendance ... by process or other reasonable means." This requirement is in line with our prior case law, holding that the party wishing to introduce the statement must subpoena the witness and prove that the witness is unavailable. Peeples v. State, 218 So.2d 436 (Miss. 1969).
To further illustrate the point, consider the stringent requirements imposed upon the state when it seeks to introduce prior testimony of a witness who is unavailable. In that situation, the Confrontation Clause of the sixth amendment mandates that "the prosecution must either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant ... (and) countenances only hearsay marked with such trustworthiness that `there is no material departure from the reason of the general rule.'" Ohio v. Roberts, 448 U.S. 56, 65, 100 S.Ct. 2531, 2538-39, 65 L.Ed.2d 597, 607 (1980). It is my opinion that this requirement should apply to both parties equally.
In this case, there is little evidence which can be gleaned from the record as to why Carter was not present at trial. The attorney for the defendant stated to the court at one point that a subpoena had been issued for Carter and returned "not found." However, that subpoena was never made a part of the record, and there is no indication that it was even shown to the court below. Furthermore, when Carter's mother testified, she stated that no one had attempted to serve her son with process since the first trial. She also testified that her son planned to stay in Germany with his father, who is, presumably, in the military. According to Mrs. Carter, T.C. would not be returning to this country before his father's tour was up, "[i]f it's not necessary."
In light of this evidence, I could not say that T.C. Carter was "unavailable." Thus, I would hold his former testimony inadmissible as hearsay not within the former testimony exception.
The majority's opinion would extend the rationale of Chambers to hold that the testimony should be admitted in spite of its failure to come under an exception to the hearsay rule. I would not go so far. Chambers involved a unique set of circumstances, where not one evidentiary rule, but the cumulative effect of two rules, deprived the defendant of due process at his trial. The rules involved were the voucher rule and the declaration against penal interest. In reversing the conviction, the United States Supreme Court did not invalidate either of the evidentiary rules, but, "[r]ather, we hold quite simply that under the facts and circumstances of this case the rulings of the trial court deprived Chamber of a fair trial." (Emphasis added) 410 U.S. at 303, 93 S.Ct. at 1049, 35 L.Ed.2d at 313. In limiting the holding, that Court did not issue any sweeping mandate to this Court to change any existing law on the admissibility of hearsay, but only examined the peculiar facts of a particular case and found that the defendant did not there receive a fair trial.
Consider the facts of Chambers, The out-of-court admission had been made spontaneously to three different persons shortly after the event; the admissions corresponded to eyewitness' testimony of the shooting; and the declarant was in the courtroom under oath, where he could be examined as to the statements. In our case, the admission by Carter was made only to a young girl, at a dance, under circumstances more suggestive of braggadocio than candor. The girl to whom Carter made the *778 statement, Alicia Rainey, testified that it was made on March 7, 1983, when the crime did not even take place until April 26 of that year. The so-called confession is completely at odds with eyewitness testimony, all of which points to Parker as the man who started the fire. Finally, Carter, the declarant, was safely in Germany when the testimony was offered, with little or no attempt being made to reach him. This case comes nowhere near Chambers, which, in any event, dealt with an entirely different exception to the hearsay rule. I would not extend the rationale of Chambers to cover this case.
The exclusion of this testimony did not deprive the defendant in this case of due process. To suggest that the exclusion was the only reason the first jury could not agree on a verdict while the second jury returned a verdict of guilty is to ignore the fact that twelve completely different persons sat on the second jury. Finally, and I repeat, the circumstances of this case do not suggest that the out-of-court statement by Carter was trustworthy; they suggest just the opposite. The statement appears to be the brash assertion of a young boy attempting to impress a young girl. As recognized in Brown, "Many motives apart from the love of truth and justice, induce men to assume the gravest risks." (99 Miss. at 728, 55 So. at 962.) The phrase, "Don't call me the flamethrower, call me the destroyer." is hardly suggestive of the gravity of thought required to assume that an out-of-court confession is inherently reliable. Furthermore, at the only examination of Carter regarding the statement, at the first trial, he recanted the admission.
In sum, I believe that this testimony is the very type of inherently untrustworthy hearsay that the rules were designed to exclude, and I strongly oppose carving another exception to the hearsay rules to allow its admission.
WALKER, C.J., HAWKINS, P.J., and GRIFFIN, J., join this dissent.
NOTES
[1] Cheaper's Chicken was formerly and is now Popeye's Chicken, several witnesses refer to it as Popeye's. Church's Chicken is located at the same intersection and is referred to also.
[2] The Mississippi Rules of Evidence, effective January 1, 1986, contain no res gestae exception to the hearsay rule. See Official Comment to Rules 803(1) and (2). To be admissible, statements such as that at issue here must come within the present sense impression or excited utterance exceptions. Rule 803(1) and (2), Miss. R.Ev.
[3] Under the new Mississippi Rules of Evidence, admission of photographs in homicide prosecutions will be governed by Rules 401-403. In the end the question, committed to the sound discretion of the trial judge, will be whether the probative value of such photographs is substantially outweighed by the danger of unfair prejudice. Rule 403, Miss.R.Ev.
[4] Effective January 1, 1986, the former testimony exception to the hearsay rule may be found in Rule 804(b)(1), Miss.R.Ev.
[5] The old voucher rule was repealed in civil cases, effective January 1, 1982. Harris v. Buxton T.V., Inc., 460 So.2d 828 (Miss. 1984). It stands repealed in criminal cases, effective January 1, 1986. Rules 607 and 611(c), Miss.R.Ev. At the time of the trial here under scrutiny, the rule was in effect, subject to Chambers limitations.
[6] The statement against interest hearsay exception made a part of our law, effective January 1, 1986, via Rule 804(b)(3), Miss.R.Ev., is broader than the exception we have previously recognized. We have no occasion here to consider whether Rule 804(b)(3) may in any way undermine Thompson, Lee or Fermo, and we express no opinion in that regard.