CARLTON, J.,
for the Court:
¶ 1. A jury convicted Eric DeShawn Jackson in the Warren County Circuit Court of three counts of depraved-heart murder. The circuit judge then sentenced Jackson to three consecutive life sentences in the custody of the Mississippi Department of Corrections (MDOC) without the possibility of parole.
¶ 2. Jackson argues on appeal that the jury verdict is against the overwhelming weight of the evidence; thus, the circuit court erred in refusing to grant his motion for a new trial or, in the alternative, his motion for a judgment notwithstanding the verdict (JNOV). Jackson also argues that the circuit court erred by allowing the State to admit multiple photographs of the victims into evidence, claiming that the photographs possessed no probative value. Jackson now asks this Court to reverse and vacate both his convictions and sentences for the three counts of depraved-heart murder, and he urges this Court to remand this case to the circuit court for a new trial. We, however, find no error and affirm Jackson’s convictions and sentences.
FACTS
¶ 3. On June 26, 2008, at approximately 6:00 p.m., officers from the Vicksburg Police Department responded to a call regarding a shooting on Ken Karyl Avenue. When the officers arrived on the scene, they found Denise Jackson, who was mortally injured from a bullet wound to the chest. She subsequently died as a result of the injury. Denise was pregnant when she was shot, and her unborn fetus also died due to deprivation of oxygen as a result of Denise’s death.
¶ 4. Marquis Bland testified that on the afternoon of the shooting, he was at 2634 *36 Ken Karyl Avenue, the home of Lucius Jackson, where Bland lived with Denise, his fiancée and also Lucius’s granddaughter, and Denise’s children, Jamari and Toni, and Bland’s child with Denise, Ashley. Bland testified that he went outside onto the porch of the house at approximately 5:30 p.m. Bland stated that he noticed people at his mother’s house located next door at 2632 Ken Karyl Avenue. He observed people standing around “like they was [sic] watching something.” Bland walked next door; he testified that he saw Jackson and Rodriguez Lyons, Bland’s fifteen-year-old brother, arguing. Bland stated that he saw Jackson holding Lyons by the collar, and he heard Jackson yelling: “Give me my shit. You broke off in my house. You stole my shit. Where’s my shit at?” Bland proceeded to run into the house, where Bland testified that he and his cousin, Jonathan Jackson, grabbed Jackson and pushed him out of the house. Bland stated that after he and Jonathan removed Jackson from the house, Jackson told them that he was “fixing to go get my scrap.”[1] Jackson further stated that “when I get back, every mother f* *ker better be gone.”
¶ 5. Bland testified that Jackson left, and Bland remained outside of the house and talked to Preston Qualls. While talking to Qualls, Bland stated that he heard someone say, “there he go [sic] right there.” Bland observed Jackson walking down Ken Karyl Avenue, “coming off the hill with a rifle.” Bland testified that Jackson stopped, raised the rifle, and started shooting. Lucius testified that he heard one shot, followed by four or five shots a few minutes later. Bland ducked, and Qualls ran in between the houses. After the shooting stopped, Bland stated that he ran to Lucius’s house and saw Denise “sliding down the wall, and she was holding her chest.” Bland held Denise and screamed for help. Bland heard Denise gasp, and he put his hand on her stomach. Bland testified that he “felt like some kicks in her stomach, and then the kicks just stopped.”
¶ 6. Vicksburg Police Officer Eric Proctor arrived first on the scene. Officer Proctor testified that he spoke to Bland, who seemed “very hysterical, upset.” Officer Proctor stated that Bland told him he heard shots, but he never mentioned a suspect. However, in an interview with Investigator Ken Smith, conducted approximately two hours after the shooting, Bland identified Jackson as the shooter, and he reported that he had seen Jackson seconds before the shooting started. Lieutenant Linda Hearn of the Vicksburg Police Department arrived on the scene approximately an hour after the shooting and found twenty-one shell casings lying in the street on Ken Karyl Avenue; she also located three nine-millimeter shell casings on the opposite side of the street.
¶ 7. A neighbor, Brenda Shelby, also testified that she saw Jackson with a large rifle in the same vicinity where over twenty of the shell casings were found. Shelby had previously dropped her children off at her home on Royal Street, which intersects Ken Karyl Avenue, and proceeded to drive to the grocery store. On the way to the store, Shelby testified that she saw Jackson get out of a car and pull a gun out of the back of the car. Shelby stated that she told Jackson, “don’t get yourself into any trouble,” but he just stared at her. Shelby drove to a gas station to call the police, but as she began to call, she saw police cars drive by and heard an ambulance. Shelby immediately drove back home to check on her children. Shelby testified that police officers never contacted her regarding the shooting, and she *37 never contacted the police department. The first time that Shelby was contacted for information regarding the shooting was by Assistant District Attorney Dewey Arthur.
¶ 8. On the day after the shooting, Lieutenant Hearn responded to a call from 2630 Ken Karyl Avenue, where the police had found the body of Qualls in the backyard of a house, which was located approximately eighty-four feet from where Denise had been shot. The State presented evidence at trial to show that Qualls’s gunshot wounds were inflicted during the same time period as the incident that had killed Denise and her unborn child.
¶ 9. Early the following morning, June 27, 2008, Jackson turned himself over to the police, and a grand jury subsequently indicted him on three counts of depraved-heart murder. Following the trial held on March 23-25, 2009, the jury convicted Jackson of three counts of depraved-heart murder and sentenced him to three consecutive life sentences. Jackson subsequently filed a motion for a JNOV or, in the alternative, a motion for a new trial. The circuit court entered an order denying these post-trial motions on March 30, 2009. Jackson now appeals.
DISCUSSION
I. Whether the circuit court erred in refusing to grant Jackson’s motion for a new trial or, alternatively, motion for a JNOV.
¶ 10. Jackson argues that the circuit court erred in denying his motion for a new trial, claiming that the overwhelming weight of the evidence failed to support the jury’s verdict. Jackson also argues that the circuit court erred in denying his motion for a JNOV, alleging that the facts and inferences presented at trial were legally insufficient to prove Jackson’s guilt beyond a reasonable doubt.
¶ 11. The Mississippi Supreme Court addressed the difference between a motion for a JNOV, as opposed to a motion for a new trial, in stating: “While a motion for a judgment notwithstanding the verdict is considered with regard! ] to the legal sufficiency of the evidence, a motion for a new trial delves into the overwhelming weight of the evidence.” McLendon v. State, 945 So.2d 372, 384 (¶ 34) (Miss.2006) (citing Bush v. State, 895 So.2d 836, 843-44 (¶ ¶ 16-19) (Miss.2005)). Therefore, Jackson’s motion for a JNOV and Jackson’s motion for a new trial will be addressed separately with the proper application of the correct standard of review.

A. Motion for a New Trial

¶ 12. We note that for a verdict to survive, motions for a new trial require “[a] greater quantum of evidence favoring the State.” Dilworth v. State, 909 So.2d 731, 737 (¶ 20) (Miss.2005). This standard requires reversal if the circuit court abused its discretion in denying the motion for new trial. Id. We, therefore, defer to the discretion of the circuit judge, and “we will not order a new trial unless convinced that the verdict is so contrary to the overwhelming weight of the evidence that, to allow it to stand, would be to sanction an unconscionable injustice.” McLendon, 945 So.2d at 385 (¶ 40) (citing Groseclose v. State, 440 So.2d 297, 300 (Miss.1983)). Thus, the power to grant a new trial should be invoked only in exceptional cases where the evidence preponderates heavily against the verdict. Bush, 895 So.2d at 844 (¶ 18) (citing Amiker v. Drugs for Less, Inc., 796 So.2d 942, 947 (¶ 18) (Miss. 2000)).
¶ 13. Jackson argues that the State failed to raise any reasonable inferences during the trial to support the jury verdict. *38 Jackson specifically points to inconsistencies between Bland’s statements to the police and his testimony at trial. Jackson argues that when Officer Proctor interviewed Bland about the shooting, immediately after responding to the 911 call, Bland told Officer Proctor that he had heard gunshots. Jackson asserts Bland never identified Jackson as the shooter. However, during Investigator Smith’s interview with Bland, approximately two hours after the shooting, Bland identified Jackson as the shooter, stated that he saw the top of Jackson’s head, and also stated that he saw Jackson firing shots. Then, at trial, Bland testified that he saw Jackson, “totally visible,” raise his rifle and start shooting. Jackson argues that these inconsistent statements relate to the credibility of Bland’s testimony and provide support for his argument that the jury verdict is contrary to the overwhelming weight of the evidence and, thus, warrants reversal.[2]
¶ 14. Jackson next points to the testimony of Shelby, claiming that her testimony suffers from the same “fatal inferential credibility issues” as Bland’s testimony due to her failure to come forward to the police after the shooting. At trial, Shelby testified that the police department never contacted her regarding the shooting; she stated that she never spoke to anyone about the shooting until Assistant District Attorney Arthur contacted her nine months after the shooting. When asked about her failure to contact police regarding the shooting, Shelby testified that she “was scared for [her] and her kids,” and that she had “known [Jackson’s] family forever.” During cross-examination, Jackson’s attorney attempted to question Shelby about her statements to Assistant District Attorney Arthur, where he transcribed that Shelby told him that she had heard gunshots on the day of the shooting. Shelby testified that she saw Jackson with the gun, but she never heard any gunshots. Both attorneys approached the bench, and Assistant District Attorney Arthur admitted that he might have made a mistake when transcribing his interview with Shelby. However, at trial, Assistant District Attorney Arthur stipulated to the document containing Shelby’s previous statements to him, and the circuit judge entered the document into evidence.
¶ 15. Despite Jackson’s arguments attacking the credibility of Bland’s and Shelby’s testimonies, we note that the Mississippi Supreme Court has held that “the jury is the sole judge of the credibility of witnesses, and the jury’s decision based on conflicting evidence will not be set aside where there is substantial and believable evidence supporting the verdict.” Billiot v. State, 454 So.2d 445, 463 (Miss.1984). Wfliere the verdict turns on the credibility of conflicting testimony and the credibility of the witnesses, we note that it is the jury’s duty to resolve the conflict. Nicholson v. State, 523 So.2d 68, 70-71 (Miss. 1988); Gandy v. State, 373 So.2d 1042, 1045 (Miss.1979); Shannon v. State, 321 So.2d 1, 2 (Miss.1975); Bond v. State, 249 Miss. 352, 356-57, 162 So.2d 510, 512 (1964). As stated above, a jury’s findings will not be disturbed by this Court unless “the verdict is so contrary to the overwhelming weight of the evidence that, to *39 allow it to stand, would be to sanction an unconscionable injustice.” McLendon, 945 So.2d at 385 (¶ 40). In addition, in Mask v. State, 996 So.2d 106, 111-12 (¶26) (Miss. Ct.App.2008), we held that the verdict was not against the overwhelming weight of the evidence where the impeachment of a witness at trial “involved insignificant details that happened prior to the shooting.”
¶ 16. Jackson also submits that the physical and forensic evidence contradicted and discredited eyewitness testimony at trial. Jackson claims that since investigators failed to recover any gunshot residue off of his hands after he was taken into custody the morning after the shooting, the forensic evidence did not establish him as the shooter. In addition, Jackson asserts that his fingerprints were not found on any of the twenty-six rifle shell casings recovered by the police.
¶ 17. However, we note that Lieutenant Robert Stewart of the Vicksburg Police Department testified that the instructions on the gunshot-residue kit warn that after four hours, gunshot residue could either deteriorate or no longer be present on living subjects. The testimony then reflected that the crime lab typically does not perform gunshot-residue tests more than four hours after the discharge of a firearm. Lieutenant Stewart testified that despite this warning, he proceeded to perform a gunshot-residue test on Jackson approximately twelve hours after the shooting. Lieutenant Stewart stated that Jackson informed him that he had bathed prior to submitting to the gunshot-residue test. James Burchfield, a forensic scientist at the Mississippi Crime Laboratory, also testified regarding the four-hour rule regarding gunshot-residue testing. He opined that it would be highly unlikely to find gunshot residue on a person twelve hours after having fired a weapon. Regarding Jackson’s claim that his fingerprints were not found on the shell casings, Lieutenant Stewart testified that the police department seldom recovers fingerprints on shell casings due to the oil and powder residue that accumulate on the casings after they are fired. Despite Jackson’s argument that the lack of physical evidence provides proof of his innocence, we note that in Bownes v. State, 861 So.2d 1061, 1063 (¶ 6) (Miss.Ct.App.2003) (citation omitted), this Court held that “the absence of physical evidence does not negate a conviction where there is testimonial evidence.” The verdict herein is supported by the overwhelming weight of the evidence. We, therefore, find no merit to Jackson’s assertion that the circuit judge abused his discretion in denying the motion for a new trial.

B. Motion for a JNOV

¶ 18. In turning to the denial of Jackson’s motion for a JNOV, we note that this Court applies an abuse-of-discretion standard of review for post-trial motions. Dilworth, 909 So.2d at 736 (¶ 17). In a motion for a JNOV, we examine whether the verdict was based on legally sufficient evidence. Bush, 895 So.2d at 843 (¶ 16). In Bush, the supreme court explained that when determining whether the evidence is sufficient to support a conviction, “the critical inquiry is whether the evidence shows ‘beyond a reasonable doubt that [the] accused committed the act charged, and that he did so under such circumstances that every element of the offense existed[.]’ ” Id. (quoting Carr v. State, 208 So.2d 886, 889 (Miss.1968)). The evidence is insufficient to sustain a conviction where it fails to meet this test. Id. As a result, “the applicable question is whether ‘after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.’” McLendon, 945 So.2d at 384 *40 (¶35) (citing Dilworth, 909 So.2d at 736 (¶ 17)). On appeal, the reviewing court is not required “to ‘ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt.’ ” Id.
¶ 19. In addition, when the facts and inferences “point in favor of the defendant on any element of the offense with sufficient force that reasonable [jurors] could not have found beyond a reasonable doubt that the defendant was guilty,” the proper remedy is for us to reverse and render. Dilworth, 909 So.2d at 736 (¶ 17); Edwards v. State, 469 So.2d 68, 70 (Miss.1985). On the other hand, when the facts and inferences considered reveal a result in which “reasonable fair-minded [jurors] in the exercise of impartial judgment might reach different conclusions on every element of the offense,” the evidence is deemed sufficient. Dilworth, 909 So.2d at 736 (¶ 17).
¶ 20. Mississippi Code Annotated section 97-3-19(l)(b) (Rev.2006) defines depraved-heart murder as:
(1) The killing of a human being without the authority of law by any means or in any manner shall be murder in the following cases:
(b) When done in the commission of an act eminently dangerous to others and evincing a depraved heart, regardless of human life, although without any premeditated design to effect the death of any particular individual;
Jackson argues that the State had to prove that Jackson killed Denise, her unborn child, and Qualls while in the commission of an eminently dangerous act, and he submits that the State failed to meet this burden. Jackson claims that after hearing the- inconsistencies between the eyewitness testimony and the forensic evidence, no reasonable juror could have found him guilty of murder. Jackson also alleges that the forensic evidence failed to identify him as the shooter.
¶ 21. However, a review of the record shows that the State presented evidence that Denise and Qualls died as the result of gunshot wounds. Byron McIntyre, a forensic scientist at the Mississippi Crime Laboratory, testified that Denise and Qualls were killed by the same type of bullets and that the bullets were fired from the same weapon, an AK-47 rifle. Dr. Steven Hayne further testified that Denise’s gunshot wound caused the death of her unborn fetus. Also, as previously stated, Bland provided testimony that moments before the shooting, he heard Jackson threaten to “go get [his] scrap,” and then saw Jackson fire a rifle into the neighborhood where Qualls and Denise were shot. Shelby also testified that she observed Jackson retrieve a gun from a car moments before the shooting occurred.
¶ 22. In the present case, we find that sufficient evidence exists to support the jury verdict finding Jackson guilty of three counts of depraved-heart murder. Accordingly, we find no abuse of discretion by the circuit court in denying either of Jackson’s post-trial motions. This issue lacks merit.
II. Whether the circuit court violated Mississippi Rule of Evidence 403 when it admitted photographs of the victims’ bodies.
¶ 23. Jackson next argues that the circuit court violated Mississippi Rule of Evidence 403 in admitting three photographs of the victims — Denise, her unborn fetus, and Qualls — which were introduced during the testimony of two of the State’s witnesses. With respect to the photographs in issue, the photograph of Qualls was a closeup, color photograph of his head and face, which revealed that his body had already started to decompose by *41 the time the police found him. The photograph of Denise showed the inside of the house where she died, and it shows her topless body with medical tubes inserted in it. The photograph of Denise’s unborn fetus was an autopsy photograph taken at Dr. Hayne’s laboratory. Jackson claims that these photographs rose to the level of graphically disturbing, and he alleges that the State tactically contrived the admission of the photographs into evidence to inflame the jury. He asserts that the photographs possessed no probative value.
¶ 24. Mississippi Rule of Evidence 403 states that: “Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury ... or needless presentation of cumulative evidence.” In McNeal v. State, 551 So.2d 151, 159 (Miss. 1989), the Mississippi Supreme Court established two guidelines for the admission of “gruesome” photographs, stating: “(1) whether the proof is absolute or in doubt as to [the] identity of the guilty party, as well as, (2) whether the photographs are necessary evidence or simply a ploy on the part of the prosecutor to arouse the passion and prejudice of the jury.” Additionally, the supreme court held: “Some ‘probative value’ is the only requirement needed to buttress a trial judge’s decision to allow photographs into evidence.” Parker v. State, 514 So.2d 767, 771 (Miss. 1986).
¶ 25. The supreme court further established that the admissibility of photographs rests within the sound discretion of the circuit court. Manix v. State, 895 So.2d 167, 177-78 (¶ 30) (Miss.2005). Additionally, we will uphold the decision of the circuit judge unless an abuse of discretion occurs. Id. We acknowledge that the discretion of a circuit judge “runs toward almost unlimited admissibility regardless of the gruesomeness, repetitiveness, and the extenuation of probative value.” Id.
¶ 26. The record shows that in the present case, the circuit judge reviewed the photographs in his chambers before the trial, and he also conducted a Rule 403 balancing test, wherein he carefully weighed the probative value of the evidence against its potential prejudice to Jackson. The circuit judge acknowledged that the State bore the burden of proving the elements of the indictment, including the following: Jackson fired a weapon multiple times toward Denise’s residence, which resulted in Denise’s death and the death of her unborn child; Jackson fired a weapon multiple times in the direction of Qualls, which resulted in Qualls’s death; and these acts constituted acts which were eminently dangerous to others, thus, evincing a depraved heart. Additionally, the State asserted that the photographs constituted necessary evidence to corroborate the testimony of the witnesses for identification, cause of death, and circumstantial purposes. The State charged Jackson with three counts of depraved-heart murder; thus, the circuit judge concluded that the photographs possessed probative value as to material issues in controversy or an element that the State must prove. The circuit judge also ruled that Jackson could not force the State to stipulate to the fact that an unborn child had died. The circuit court found that this fact pertained to an element of the offense charged in the indictment. Since the State bore the burden to prove each element of the charged offense beyond a reasonable doubt, then the circuit court held that State could enter the photographs into evidence as probative, relevant evidence to prove these elements.
¶ 27. In the instant case, we find no abuse of discretion by the circuit judge in determining that the photographs of the *42 victims’ bodies had substantial probative value. The photographs of Denise and Qualls identified the victims, and the photographs showed the bodies as the police found them at the crime scene. The State offered the photograph of Qualls into evidence, during the cross-examination of Lieutenant Hearn, in an attempt to counter questions from the defense about whether a possibility existed that Qualls did not receive his gunshot wounds on the same day as Denise. The State offered the photograph of Qualls’s decomposing face to show the exposure of his body to the weather elements, thus, providing support to the State’s argument that Jackson had shot Qualls on same day as Denise. The photograph of Denise shows her pregnant body lying on the floor inside of her house and also depicts the injuries she received as a result of the shooting. The State offered this photograph into evidence to meet its burden of proving the elements of depraved-heart murder by showing that Jackson indeed shot into Denise’s residence and killed her. Finally, the State offered the photograph of the third victim, Denise’s unborn fetus, during Dr. Hayne’s testimony to aid in his explanation of how the unborn fetus died. The State also offered the photograph for the purpose of showing proof that Denise was pregnant when she was shot and that her unborn fetus had died as a result of the gunshot wound received by Denise.
¶ 28. All three photographs also helped corroborate the State’s assertion of the manner, time, and cause of death. Thus, we cannot say the admission of the photographs, either individually or collectively, prejudiced Jackson’s right to a fair trial. Moore v. State, 932 So.2d 833, 838 (¶ ¶ 10-14) (Miss.Ct.App.2005). Accordingly, no abuse of discretion exists in the circuit court’s admission of the photographs. Thus, this assignment of error is without merit.
¶ 29. In conclusion, we find both of Jackson’s assignments of error lack merit; therefore, we affirm Jackson’s convictions and sentences.
¶ 30. THE JUDGMENT OF THE WARREN COUNTY CIRCUIT COURT OF CONVICTION OF THREE COUNTS OF DEPRAVED-HEART MURDER AND SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS ON EACH COUNT WITHOUT THE POSSIBILITY OF PAROLE WITH THE SENTENCES TO RUN CONSECUTIVELY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J, LEE AND MYERS, P.JJ., IRVING, GRIFFIS, BARNES, ISHEE, ROBERTS AND MAXWELL, JJ., CONCUR.

. Bland testified that he understood the word “scrap” to mean a pistol or gun.

. We note the record reflects that during his testimony, Bland explained the inconsistencies in his statements to Officer Proctor and Investigator Smith. Bland provided his statement to Officer Proctor moments after seeing his fiancée and unborn child die. Bland testified that at the time he spoke to Officer Proctor, he was more concerned with the condition of his loved ones than giving an accurate statement about the details of the shooting.