594 So.2d 587 (1992)
Jimmy EDWARDS
v.
STATE of Mississippi.
No. 90-KA-0708.
Supreme Court of Mississippi.
January 22, 1992.
Sam Clifton, Sr., Cleveland, for appellant.
Mike C. Moore, Atty. Gen., Pat S. Flynn, Asst. Atty. Gen., Jackson, for appellee.
Before HAWKINS, P.J., and PRATHER and SULLIVAN, JJ.
PRATHER, Justice, for the Court:

I. INTRODUCTION
In this case, the Bolivar County Grand Jury indicted Jimmy Edwards in November 1989 on three counts of sexual battery under Miss. Code Ann. §§ 97-3-95 & 99-7-2 (1972). More specifically, the Grand Jury indicted Edwards for "feloniously engag[ing] in sexual penetration with [his seven-year-old nephew], FJ, by inserting his penis into the anus [and] mouth of said FJ."
*588 Upon completion of a trial at the Bolivar County Circuit Court, the jury found Jimmy Edwards guilty of all three counts. Judge John L. Pearson sentenced Edwards to fifteen years imprisonment for each of the first two counts and twenty years on the third count.[1]

A. Facts
On June 11, 1990, FJ testified that his uncle, Jimmy Edwards, sexually battered him on three separate occasions. On the first occasion, in July 1988, FJ and three of his cousins were playing outside Edwards' home when Edwards called FJ to come inside. Once inside, Edwards anally raped FJ. See Appendix, infra (FJ's testimony).
On the second occasion, in the summer of 1989, FJ and his three cousins were again playing outside Edwards' home. Edwards again called FJ "to step inside"  after which Edwards "started sucking on [FJ's] thing" and then "made [FJ] do the same thing to him [Edwards]." See Appendix, infra (FJ's testimony).
Finally, FJ testified that, in August 1989, Edwards again anally raped him in a bedroom of Edwards' home. FJ's cousin, ten-year-old ALS, testified that she witnessed the incident which transpired in the bathroom of Edwards' home. See Appendix, infra (ALS's testimony).
Edwards' sexual activities ultimately ended when FJ informed his mother, TS, about the incidents. TS testified that FJ "felt ashamed" and was "real scared" when he discussed the matter with her. TS then testified that she contacted the Bolivar County Sheriff's Department and provided investigators with the information about the incidents; Charles Gilmer was one of these investigators.
Gilmer testified that, during his investigation, he interviewed FJ and ALS and that both children described the acts committed by Edwards.[2] These interviews, Gilmer noted, led to the arrest of Edwards.
Of course, Edwards denied the accusations, and his wife, Patsy, provided supportive testimony.[3]

B. Issues
As noted, a jury found Edwards guilty of sexual battery. He now appeals his conviction and has presented this Court with six issues. For brevity's sake, these issues have been paraphrased and consolidated:
1. WHETHER THE TRIAL JUDGE ERRONEOUSLY REFUSED TO PERMIT EDWARDS' CHILDREN TO TESTIFY?
2. WHETHER THE TRIAL JUDGE ERRONEOUSLY REFUSED TO GRANT EDWARDS' MOTION FOR A CONTINUANCE?
3. WHETHER THE TRIAL JUDGE ERRONEOUSLY REFUSED EDWARDS' INSTRUCTIONS?
4. WHETHER THE TRIAL JUDGE ERRONEOUSLY REFUSED TO GRANT EDWARDS' MOTIONS FOR A DIRECTED VERDICT, J.N.O.V., AND NEW TRIAL?

II. ANALYSIS

A. Issue # 1
Edwards asks this Court to determine whether the trial judge erroneously refused to permit his two children, FP and FS, to testify. FP and FS were among the children playing outside Edwards' home prior to at least two of the rape incidents.

*589 1. Background

On March 30, 1990, Bolivar County Youth Court Judge John W. Valentine conducted a hearing in response to a petition filed by the Bolivar County Department of Human Services. On the basis of the evidence adduced at this hearing, Judge Valentine issued a protective order, in which he declared FP and FS "to be abused children." He ordered that there "be no contact by the parents with the children" and that "any future contact by the parents with the children is to be determined by the Bolivar County Mental Health Counselor, Mr. Paul Davey."
No one disputes that Edwards was "aware" of this order. And no one disputes that Judge Valentine issued sanctions against Edwards for violating the order when he called FP and FS to testify at a trial (not the trial in the case sub judice) in which he and his wife were being prosecuted for dissemination of sexually-explicit material to minors (hereinafter "dissemination case"). Specifically, the judge issued the sanctions because Edwards called FP and FS to testify and, thus, violated the order that there "be no contact by the parents and the children" without first informing the Youth Court (FS did not actually testify, and FP became emotionally distraught while testifying).
In the case sub judice, Edwards attempted to subpoena FP and FS to testify on his behalf; however, he did not first inform the Youth Court. Thus, FP and FS's guardian ad litem presented to Bolivar County Circuit Court Judge John L. Pearson a motion to have FP and FS declared unavailable for trial. The guardian cited as her bases for the motion: (1) the protective order, and (2) the probable emotional harm to FP and FS which testifying might cause.
Judge Pearson held a pre-trial hearing on the guardian's motion. The judge heard from Edwards, the guardian, and the county attorney  the latter two of whom spoke on behalf of the Youth Court. The judge also heard from Paul Davey,[4] who provided his explanation for concluding that the children would be emotionally harmed if permitted to testify.
After the hearing, the judge expressed an inclination to grant the guardian's motion[5] absent a showing by Edwards of a "colorable need" for calling his children to testify:[6]
JUDGE PEARSON: [T]his Court needs to know and would request of the defense that they make an offer of proof by stating to the Court what they know or feel or what information they have as to what testimony these children might give, either one or both of them.
EDWARDS: Your Honor, the only thing that we have to offer here is some of the same things that we offered in trial last week [in the dissemination case].
JUDGE: Well, I wasn't present, so I don't know.
... .
EDWARDS: ... Specifically, we believe that the children are going to just plainly deny that anything took place... .
... .
JUDGE: Let me ask you this... . Have you ... ever interviewed these children?
EDWARDS: No, sir.
JUDGE: Well, you really didn't know what they were going to testify to when they came in the court the other day?
EDWARDS: Somewhat, Your Honor. I have never talked to the children.
Id. at 34 & 36-37. Judge Pearson finally concluded that no colorable need existed *590 for permitting Edwards to call his children to testify.

2. Relevant Law[7] and Disposition

In response to the judge's decision, Edwards contends in this appeal that the State should have been "estopped from raising the [availability] issue at such late date" because: (1) FP had already testified during the trial in the dissemination case, and (2) the State failed to timely object to the children being called to testify during the trial in the case sub judice.
Edwards' contention is unpersuasive. In this case, the guardian  not the State  was charged with protecting the children's interest. See Miss. Code Ann. § 43-21-121(1)(e) & (2) (1972 as amended) ("The youth court shall appoint a guardian ad litem for the child ... in every case involving an abused or neglected child which results in a judicial proceeding; ... In addition to all other duties required by law, a guardian ad litem shall have the duty to protect the interest of a child for whom he has been appointed."). Therefore, Edwards is wrong to refer to the State and its failure to object.
And Edwards cannot quarrel with the guardian's decision to seek to enforce the Youth Court's "Protective Order" at such a "late" date. Edwards flagrantly ignored the Protective Order in the case sub judice  just as he had done in the dissemination case  and the guardian was simply attempting to avert another flagrant violation of the "Protective Order" which could have resulted in the issuance of additional sanctions. It seems likely that the guardian would have presented her motion in a more timely manner if Edwards had complied with the "Protective Order" and informed the Youth Court before attempting to call the children to testify. In accordance with the "Protective Order," the guardian was duly entitled to do whatever was necessary to protect the interest of the children  no matter how untimely Edwards perceives her actions to be. Edwards should have followed rules of procedure which should have been familiar to him in view of the sanctions issued against him for failing to inform the Youth Court before calling his children to testify in the dissemination case.
Edwards additionally contends that the judge's refusal to permit his children to testify is violative of the federal and state constitutions, which entitle a defendant to access to witnesses. Appellant's Brief at 6 (citing U.S. CONST. amend. VI; MISS. CONST. art. 3, § 26). This Court's opinion in Gray v. State, 472 So.2d 409, 412-13 (Miss. 1985), addresses Edwards' contention. In short, this Court held in Gray that "the accused's right to compulsory process is not absolute and the State [or judge] may require a showing of some colorable need for persons to be summoned lest the right be abused." Id. at 413 (citing cases for support). Accordingly, in the case sub judice, the judge provided Edwards with an opportunity to show a "colorable need"; however, Edwards was unable to meet this burden. At most, Edwards noted that he "believe[d] that the children [would] just plainly deny that anything took place." Edwards' belief is highly questionable; neither he nor his attorney had interviewed the children, nor had they sought the Youth Court's permission to interview them. In view of the foregoing, this Court rejects Edwards' contention that the federal and state constitutions provide him with an absolute right to call his children to testify and concludes that the record clearly reveals that Edwards failed to show a "colorable need" as required in Gray.[8] The request for a protective order was "addressed to the trial court's sound discretion, and this Court concludes that Edwards has not demonstrated that the *591 court's ruling was so fundamentally unfair as to deprive him of due process of law." Id. at 413 (citing United States v. Wilson, 732 F.2d 404, 412 (5th Cir.1984)).

B. Issue # 2
When the judge declined to permit the children to testify, Edwards requested a continuance. The State opposed the request because Edwards had failed to utilize the ample opportunity he had been afforded to seek permission to call his children to testify. The judge denied Edwards' request and cited his failure to comply with applicable procedural guidelines as the basis for his denial. These guidelines are codified in Miss. Code Ann. § 99-15-29 (1972):
On all applications for a continuance the party shall set forth in his affidavit the facts which he expects to prove by his absent witness or documents that the court may judge of the materiality of such facts, the name and residence of the absent witness, that he has used due diligence to procure the absent documents, or presence of the absent witness, as the case may be, stating in what such diligence consists, and that the continuance is not sought for delay only, but that justice may be done. The court may grant or deny a continuance, in its discretion, and may of its own motion cross-examine the party making the affidavit. The attorneys for the other side may also cross-examine and may introduce evidence by affidavit or otherwise for the purpose of showing to the court that a continuance should be denied. No application for a continuance shall be considered in the absence of the party making the affidavit, unless his absence be accounted for to the satisfaction of the court. A denial of the continuance shall not be ground for reversal unless the supreme court shall be satisfied that injustice resulted therefrom. [emphasis added]
See also Smith v. State, 278 So.2d 454, 455 (Miss. 1973). (Trial judge did not abuse his discretion by refusing to grant the defendant a continuance where witnesses were deemed on the day of the trial to be incapable of testifying and the defendant had failed to comply with rules of procedure applicable to a request for a continuance.); Gates v. State, 484 So.2d 1002, 1005-06 (Miss. 1986), (Trial judge did not abuse his discretion by refusing to grant a continuance to the defendant who utterly failed to comply with Miss. Code Ann. § 99-15-29 (1972).).
In the case sub judice, it is undisputed that Edwards failed to comply with procedural guidelines in the presentation of his request for a continuance.[9] Edwards' failure aside, the judge could have denied his motion simply on the basis that he failed to show a colorable need for calling his children to testify. In other words, if a defendant is unable to show a colorable need for calling a witness to testify, then it would seem to follow that he would also be unable to cite by affidavit the materiality of the witness' testimony.
In sum, this Court concludes that the judge did not abuse his discretion by denying Edwards' request for a continuance.

C. Issue # 3
Edwards contends that the trial judge erroneously denied Instructions D-1, D-2, D-3, and D-4. Instructions D-2, D-3, and D-4 are peremptory and, thus, will be discussed in Subsection II(D) of this opinion.[10] Instruction D-1, which remains for discussion, provides:

*592 INSTRUCTION NO. D-1
The defendant, JIMMY EDWARDS, has been charged in Counts I, II and III of an indictment with the crime of sexual battery.
Under Count I, if you do not find from the evidence in this case beyond a reasonable doubt that:
(1) the defendant, JIMMY EDWARDS, on or about July 5, 1988, engaged in sexual penetration by inserting his penis into the anus of FJ's body, and
(2) FJ was a male child under the age of fourteen (14) years
then you shall find the defendant not guilty of sexual battery in Count I.
If the State has failed to prove any one or more of the above elements beyond a reasonable doubt, then you shall find the defendant not guilty in Count I.
In Count II, if you do not find from the evidence in this case beyond a reasonable doubt that:
(1) the defendant, JIMMY EDWARDS, on or about August 5, 1989, engaged in sexual penetration by inserting his penis into the anus of FJ, and
(2) FJ was a male child under the age of fourteen (14) years,
then you shall find the defendant not guilty of sexual battery in count II.
If the State has failed to prove any one or more of the above elements beyond a reasonable doubt, then you shall find the defendant not guilty in Count II.
In Count III, if you do not find from the evidence in this case beyond a reasonable doubt that:
(1) the defendant, JIMMY EDWARDS, on or between June 1, 1989, and August 31, 1989, engaged in sexual penetration by inserting his penis into the mouth of FJ and
(2) FJ was a male child under the age of fourteen (14) years,
then you shall find the defendant not guilty of sexual battery in Count III.
If the State has failed to prove any one or more of the above elements beyond a reasonable doubt, then you shall find the defendant not guilty in Count III.
Vol. II, at 57. The judge refused Instruction D-1 because he found it to be cumulative of Instruction S-1, which he granted. Instruction S-1 provides:
INSTRUCTION NO. S-1
The defendant, JIMMY EDWARDS, has been charged in Counts I, II and III of an indictment with the crime of sexual battery.
Under Count I, if you find from the evidence in this case beyond a reasonable doubt that:
(1) the defendant, JIMMY EDWARDS, on or about July 5, 1988, engaged in sexual penetration by inserting his penis into the anus of FJ's body, and
(2) FJ was a male child under the age of fourteen (14) years
then you shall find the defendant guilty of sexual battery in Count I.
If the State has failed to prove any one or more of these elements beyond a reasonable doubt, then you shall find the defendant not guilty in Count I.
In Count II, if you find from the evidence in this case beyond a reasonable doubt that:
(1) the defendant, JIMMY EDWARDS, on or about August 5, 1989, engaged in sexual penetration by inserting his penis into the anus of FJ and
(2) FJ was a male child under the age of fourteen (14) years,
then you shall find the defendant guilty of sexual battery in count II.
If the State has failed to prove any one or more of these elements beyond a reasonable doubt, then you shall find the defendant not guilty in Count II.
In Count III, if you find from the evidence in this case beyond a reasonable doubt that:
(1) the defendant, JIMMY EDWARDS, on or between June 1, 1989, and August 31, 1989, engaged in sexual penetration by inserting his penis into the mouth of FJ and
(2) FJ was a male child under the age of fourteen (14) years,
then you shall find the defendant guilty of sexual battery in Count III.

*593 If the State has failed to prove any one or more of these elements beyond a reasonable doubt, then you shall find the defendant not guilty in Count III.
Id. at 54. Edwards' only explanation for his contention that the judge erroneously refused Instruction D-1 is that it "adequately set out the elements of the offense of sexual battery."
Upon comparing the two instructions  D-1 and S-1  this Court concludes that the judge is correct; D-1 is virtually identical to, and therefore cumulative of, S-1. This Court is well aware of established case law which holds that a trial judge is not required to grant an instruction which is cumulative of another. See, e.g., Davis v. State, 568 So.2d 277 (Miss. 1990); Anderson v. State, 413 So.2d 725 (Miss. 1982).
The judge properly refused Instruction D-1 after granting Instruction S-1. This Court therefore affirms on this issue.

D. Issue # 4
Finally, Edwards contends that the judge erroneously refused his requests for a directed verdict (or peremptory instruction), j.n.o.v., and new trial.
The standards applicable to this Court's review of Edwards' various requests have been amply recited in other cases. See, e.g., Butler v. State, 544 So.2d 816, 819 (Miss. 1989) (standard applicable to review of request for a directed verdict or peremptory instruction); Pharr v. State 465 So.2d 294, 301 (Miss. 1984) (j.n.o.v.); May v. State, 460 So.2d 778, 781 (Miss. 1984) (new trial). Application of these standards to the evidence viewed in a light most favorable to the State leads this Court to conclude that the judge properly denied Edwards' requests.
The evidence proves beyond a reasonable doubt that Edwards wilfully engaged in sexual penetration  both anally and orally  with a child (FJ) under fourteen years of age. See Allman v. State, 571 So.2d 244 (Miss. 1990).

III. CONCLUSION
Based upon the foregoing, this Court affirms.
CONVICTION AND SENTENCE AFFIRMED.
ROY NOBLE LEE, C.J., HAWKINS, P.J., and ROBERTSON, SULLIVAN, PITTMAN, BANKS and McRAE, JJ., concur.
DAN M. LEE, P.J., dissents as to Issues Nos. 1 and 2 and concurs as to Issues Nos. 3 and 4 without written opinion.

APPENDIX A
FJ provided the following testimony regarding the first rape incident.
STATE: And when he called you over there, what did you do?
FJ: We went inside.
STATE: And who all was there?
FJ: It was just me and FP and FS and ALS [FJ's cousins].
STATE: And what happened after you got inside?
FJ: Well, Jimmy [Edwards] called me back to the back room, and I went back there. And he pushed me on the bed, and he stuck his thing in my butt.
STATE: Where was ALS and FP and FS when that happened?
FJ: They was in the living room. And they come back there to the back room.
STATE: Okay. Now, when he called you back to the bedroom, FJ, what did he do after he got you in the bedroom?
FJ: He put his thing in my butt.
STATE: When you're talking about "his thing," what are you talking about?
FJ: His private part.
STATE: Okay. And where were you when this happened?
FJ: In his house.
STATE: Where in his house?
FJ: In  it was in a back room, in FS's room.
STATE: It was in a bedroom?
FJ: Yes, ma'am.
STATE: And where in the bedroom were you, FJ?

*594 FJ: On the bed.
STATE: How did you get on the bed?
FJ: He pushed me down.
STATE: What did you have on that day? Do you remember?
FJ: Yes, ma'am.
STATE: What did you have on?
FJ: Some shorts and a shirt.
STATE: And when he pushed you down on the bed, what did he do?
FJ: He pulled down my pants.
STATE: Were you on your stomach or your back?
FJ: I was on my stomach.
STATE: And where was he when you were on your stomach?
FJ: On my back.
STATE: And he was on your back? Okay. And then what did he do?
FJ: He put his private part in my butt.
STATE: And what did you do?
FJ: I kept hollering, and I started crying. And I said, "Let me go." And he was holding me down on my back.
STATE: Where were his hands?
FJ: On my back.
STATE: And after he put his private part in your butt, as you called it, how long did that last?
FJ: A minute or two or less.
STATE: Okay. And then what did he tell you while this was going on?
FJ: To don't tell nobody or he would shoot my mama and then he would come  he lived so close, he would come back and do it again.
STATE: Now, after he got through and stopped, did you notice anything on the bed?
FJ: There was some white slimy stuff.
STATE: And what did he say to you then?
FJ: He just told me not to tell nobody.
STATE: Okay. And where did you go after that?
FJ: I ran home. And my stomach felt funny, and I had to use the bathroom. And when I started to wipe my butt, it had blood in the commode and blood on the toilet paper.
STATE: And did you tell your mama?
FJ: No, ma'am, I didn't tell her.
STATE: At that time you didn't tell her?
FJ: No, I didn't tell her what happened. I told her there was blood in the commode.
STATE: And then later on, did  when you all were running around playing, did Jimmy Edwards ever call you back there any other times?
FJ: Yes. But I was scared and I didn't go.
Vol. I, at 76-78.
FJ provided the following testimony regarding the second rape.
FJ: He [Edwards] asked me to step inside for a minute, and I did.
STATE: Where was Jimmy [Edwards]?
FJ: He was inside in the kitchen. And he told me to come into the bathroom for a minute.
STATE: Okay. And where was ALS?
FJ: ALS had just come in. She was just coming in from the kitchen. She stayed in the kitchen.
STATE: And where were FP and FS?
FJ: FP and FS, they was gone with their mom.
STATE: Now, when he called you in this time, what happened?
FJ: He told me to come to the bathroom, and he pulled down my shorts and started sucking on my thing.
STATE: And did he also make you do something to him?
FJ: Oh, yes, ma'am. He made me do the same thing to him.
STATE: That was in the bathroom?
FJ: Yes, ma'am.
STATE: Now, when he made you do that, where was he? Was he standing up or sitting down?
FJ: He was sitting down on the commode.
STATE: Where were you?
FJ: I was right there in the bathroom.

*595 STATE: And how were you  in relation to where he was, where were you?
FJ: On my knees.
STATE: And how long did this last?
FJ: Not even a whole minute.
STATE: It was a very short time also? And what happened when he was making you put your mouth on him?
FJ: I bit him.
STATE: And what was said when you bit him?
FJ: He told me not to never come back over there again.
Id. at 80-81.
Finally, FJ's cousin, ten-year-old ALS, testified that she witnessed the second incident which transpired in the bathroom of Edwards' home:
STATE: Now, tell us what happened while you and FJ and FP and FS were out playing.
ALS: Jimmy [Edwards]  well, he called FJ inside, and we went with him. And we saw him making FJ suck himself [sic].
STATE: Now, let's back up.
You said that you were out playing and he called you all in. Or who did you say he called in?
ALS: FJ But we went with him.
STATE: Okay. And what else did you say you saw?
ALS: We saw  I saw Jimmy making FJ suck Jimmy's private.
STATE: Now, where was FJ and Jimmy when you saw that?
ALS: They were ... in the bathroom.
STATE: And how did you come about seeing that, ALS?
ALS: We were going to the back room where there's toys at, and we saw it because the door was cracked a little bit.
STATE: You saw it?
ALS: Yes, ma'am.
Id. at 115. ALS testified about another incident she witnessed:
STATE: ... [D]id you also see Jimmy Edwards do this to FJ at other times?
ALS: Yes, ma'am.
STATE: What else did you see Jimmy Edwards do to FJ?
ALS: I saw him  he had his pants down and FJ had his pants down and he had his private parts sticking in FJ's rear end.
STATE: Where was that?
ALS: It was in his house.
STATE: It was at his house, meaning whose house?
ALS: Jimmy's.
STATE: Jimmy's house. And this was last summer?
ALS: Yes, ma'am.
STATE: And were they in a bedroom?
ALS: Yes, ma'am.
STATE: Where was FJ in the bedroom?
ALS: He was laying on the bed.
STATE: And where was Jimmy Edwards?
ALS: He was standing up, and he was doing it to FJ.
STATE: And then do you remember  well, how did you come about seeing it that time?
ALS: We was going to FS's room to play there, and I saw him doing it.
STATE: Were you in the room or just going down the hall? How did you see it?
ALS: I was going down the hall, and then we went in a room.
STATE: You went in another room after you saw that?
ALS: No, ma'am. We went in his room, Jimmy's.
STATE: You went in Jimmy's room?
ALS: Yes, ma'am.
STATE: And was that the room where FJ and Jimmy were?
ALS: Yes, ma'am.
STATE: ALS, did Jimmy Edwards ever say anything to FJ in your presence or to you when you saw what was happening?
ALS: Yes, ma'am.
STATE: What did he say?
ALS: He said, "ALS, don't tell. This is mine and yours and FJ's secret."

*596 STATE: And did he ever tell you anything that he was going to do if you told?
ALS: Yes, ma'am.
STATE: What did he tell you?
ALS: He said that he would keep on and keep on doing it.
Id. at 115-16.
NOTES
[1] The judge suspended five years from each of the three counts. The sentences will run consecutively.
[2] Paul Davey  a psychotherapist and the director of the children's treatment center at the Clarksdale Mental Health Center  also testified at the trial. Davey counselled FJ with regard to these incidents and essentially corroborated Toler and Gilmer's testimony.
[3] Patsy Edwards testified that her husband could not have sexually battered FJ because she and her husband were in Illinois on vacation during the time when one of the incidents allegedly occurred. Moreover, during the time when the other two incidents allegedly occurred, she testified that FJ was not even allowed inside their home because he once hit their daughter at school with a rock.

In denying the accusations, Edwards simply echoed his wife's testimony.
[4] As noted previously, Davey is the psychotherapist who has been counseling FJ as well as the other children.
[5] A trial judge is not wholly without authority, for example, to permit a party to interview a child who is under the Youth Court's jurisdiction. See Miss. Code Ann. § 43-21-151(1) (1990 Supp.). In the exercise of his or her authority, the trial judge should, when possible, take into consideration any conditions enunciated in the protective order concerning the involved child.
[6] The judge, for example, seems to have been willing to permit the children to testify via videotape or some other means which would have been in compliance with the protective order prohibiting contact between the children and their parents.
[7] Research revealed no published opinion in which this Court has addressed this specific issue.
[8] The State notes in its brief various remedies which Edwards could have utilized upon realizing that he would be unable to call the children to testify. For example, the State explains:

"When the children were declared unavailable, [Edwards] could have moved to introduce FP's testimony from the other [dissemination] trial." See Appellee's Brief at 10 (citing Miss.R.Evid. 804(a)(5); Parker v. State, 514 So.2d 767 (Miss. 1986)).
[9] Notably, after Edwards' request for a continuance was denied, the judge decided to delay commencement of the trial until the next day. The next day, Edwards renewed his request for a continuance. Surprisingly, Edwards again failed to comply with procedural guidelines. That is, Edwards failed to provide the judge with the required affidavit or evidence of testimony which he hoped to elicit from the children. Vol. II, at 48.
[10] Subsection II(D) discusses the issue of whether the judge erroneously denied Edwards' motion for a directed verdict; of course, a request for a peremptory instruction is treated as a request for a directed verdict. See Butler v. State, 544 So.2d 816, 819 (Miss. 1989).